### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 04-40141-01, 02 |
| | ) | |
| ARLAN DEAN KAUFMAN and | ) | |
| LINDA JOYCE KAUFMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM AND ORDER

This case comes before the court on defendants' joint motion to suppress evidence and for return of property. (Doc. 132.) Defendants incorporated a brief in their motion, the government filed a response, and defendants filed a reply. (Docs. 160, 182.) The court conducted an evidentiary hearing on August 30, 2005. Defendants' motion is GRANTED in part, and DENIED in part, for reasons set forth herein.

## I.  BACKGROUND AND PROCEDURAL HISTORY

Defendants are charged in a thirty-four count second superceding indictment with, among other things, Medicare fraud, civil rights violations, and subjecting victims to involuntary servitude, all in violation of various provisions of Title 18 of the United States Code. (Doc. 121.) In the present motion, defendants attack the validity and execution of various search warrants executed on their property over the course of the underlying investigation. Defendants requested an evidentiary hearing on the motion; however, the only testimony presented at the

hearing was a brief, unfruitful examination of the case agent. Nonetheless, the parties have agreed to the authenticity of exhibits attached to their pretrial motions and accompanying briefs. (Doc. 198 at 1.)

It appears that this case has its roots in an incident that occurred in late 1999, when children riding a school bus saw people working in the nude on defendants' farm near Potwin, Kansas. The ensuing investigation by local authorities revealed that defendant Arlan Kaufman, a Licensed Clinical Social Worker d/b/a the Kaufman Treatment Center, was administering what he described as "nude therapy" to a group of mentally-ill patients under his charge. This caught the attention of the United States Department of Health and Human Services (HHS) investigators, who suspected that this "therapy" was being billed to Medicare, and that such billings might amount to Medicare fraud based on, among other reasons, the fact that nude therapy was not a recognized means of treating mental patients. In the Matter of the Search of 1416 Grandview, Newton, Kansas, No. 01-M-6071-01-KMH, Application for Search Warrant (2001 Search Warrant Application), attach. B at 8-10.

Although the case was initially investigated by officials from Butler County, Kansas, the investigation eventually stalled and was referred to HHS. HHS investigators picked up where the local authorities left off, relying on reports from sheriff's deputies regarding the nudity incident at defendants' farm, as well as similar reports regarding interviews of defendants' mentally ill patients, all of whom apparently resided at one of two homes owned by defendants in Newton, Kansas. These properties in which

-2-

defendants housed their patients, along with defendants' residence, have generally been referred to as "the Kaufman House."  In the Matter of the Search of 1416 Grandview, Newton, Kansas, No. 04-M-6188-01-DWB, Application for Search Warrant (2004 Search Warrant Application), aff. ¶ 5; 2001 Search Warrant Application, attach. B at 8-10.

HHS also contacted the Medicare carrier for Kansas, Blue Cross Blue Shield of Kansas (BCBSKS), to obtain "peer comparison studies," which are essentially analyses of how defendants' billing practices compared with that of other medical providers of similar services.  These analyses showed that defendants consistently billed more hours than most of their peers, and usually with far fewer patients than their highest billing peers.  In fact, the investigation revealed that for 1998 defendant Arlan Kaufman was the highest biller in the state of Kansas for group psychotherapy. He achieved this distinction with only nine patients, whereas the next highest billing service provider of group therapy had 52 patients.  2001 Search Warrant Application, attach. B at 12-14.

In addition, the investigation revealed that BCBSKS had referred some of defendants' claims to Martin M. Wetzel, M.D., a psychiatrist, for review.  Dr. Wetzel concluded that all the claims were inadequately documented.  He also opined that it was questionable whether this type of treatment was even appropriate for patients with the types of disorders manifested by the Kaufman Treatment Center residents.  Finally, he noted that some of the documentation appeared to have been generated after BCBSKS requested additional treatment records and that some of the

patients had identical treatment notes, thereby implying that the documentation had been manufactured. Based on Dr. Wetzel's findings, all 641 claims under review by BCBSKS were denied. Id. at 16-17.

HHS Special Agent (SA) Ryan Filson incorporated these and other facts into a 22-page affidavit in support of a search warrant, which was presented to the federal magistrate on June 13, 2001. The warrant was issued the same day, and authorized a search of defendants' residence at 1416 Grandview, Newton, Kansas. HHS special agents executed this search warrant on June 18, 2001. In all, the agents seized over 400 pieces of evidence, including numerous multi-page documents. The evidence included bank statements, therapy notes, Medicare-related correspondence, videotapes, and photographs, just to name a few items. 2001 Search Warrant Return; (Doc. 132 exh. 3.)

Despite the zeal of the HHS investigators, the case apparently languished under the federal prosecutor initially assigned to the case. Defendants communicated with the prosecutor through counsel at various times during 2002 and, although the prosecutor indicated that he intended to seek an indictment, none was forthcoming. Finally, in May of 2003, SA Filson formally closed his criminal investigation and continued the case as an administrative investigation, seeking the imposition of fines and perhaps other penalties. Then, in September of 2004, the case caught the attention of a different federal prosecutor who saw not only the potential for the fraud-related charges, but also the possibility that defendants' treatment of the Kaufman Treatment Center patients

-4-

might amount to civil rights violations.

The criminal case was promptly re-opened and, on October 25, 2004, FBI SA Barry Petru sought search warrants for various properties associated with defendants' business, including defendants' residence at 1416 Grandview in Newton, Kansas. The warrant was executed on October 26, 2004, culminating in the seizure of numerous items, including a multitude of video and audio tapes, books, records, and five computers. 2004 Search Warrant Return. Defendants were arrested that same day and charged in a one-count complaint with holding individuals in involuntary servitude, thereby violating 18 U.S.C. §§ 1584 and 2. (Doc. 1.) Then, on November 3, 2004, the grand jury returned a single-count indictment charging the same offense as the complaint.[1] (Doc. 33.) Finally, federal investigators obtained another search warrant on January 14, 2005, which allowed them to search computers and other electronic storage media seized in the 2004 search. In the Matter of the Search of Computers, Computer discs, and a Personal Data Assistant, No. 05-M-6003, Search Warrant attach. B (2005 Search Warrant).

In their present motion, defendants present numerous arguments why some or all of the evidence seized from all three searches should be suppressed. Specifically, defendants implore the court:

> 1. To suppress as evidence all the materials
> seized in the 2001 search of their home because
> the search was a general search that violated
> their rights guaranteed by the Fourth Amendment

---

[1] That indictment has been superseded twice, with the last indictment filed on June 16, 2005 charging the thirty-four counts presently at issue. (Docs. 80, 121.)

to the Constitution. In the alternative, defendants move for the suppression of items not named in the warrant and not subject to the plain view exception to the warrant requirement.

2. To suppress as evidence all data and information obtained from the subsequent search of a computer seized in the 2001 search.

3. To suppress as evidence all the materials sized [sic] in the 2004 search of their home because those materials were the fruit of the illegal 2001 search.

4. To suppress as evidence all data and information obtained from the 2005 search of the computers seized during the 2004 search because that data and information is the fruit of the illegal 2001 search.

5. To suppress as evidence all materials seized in the 2004 search because the search warrant was overbroad and authorized the search for and seizure of items for which there was no probable cause to believe that the items would constitute fruits, instrumentalies [sic], or evidence of a crime.

6. To order the return to the defendants of their illegally seized property pursuant to Fed. R. Crim. P. 41(g).

(Doc. 132 at 1-2.)[2]  The court will address each request in turn.

---

[2]  In addition to the specific relief requested here, defendants filed additional motions attacking other aspects of the contested searches.  In the present motion, defendants alluded to seized items that were protected by the attorney-client privilege. (Doc. 132 at 7-8.)  However, they presented a separate motion addressing this issue.  (Doc. 130.)  Similarly, defendants challenged the legality of the 2001 search based on allegations of material misrepresentations in the search warrant.  (Doc. 134.) The court ruled separately on all the issues raised in those motions.  (Docs. 217, 234, 244.) With respect to the allegedly privileged materials, the court granted defendants a further opportunity to identify privileged materials and submit additional briefs.  The court specifically ruled that any attorney-client and work product privileges will be deemed waived as to any materials not identified and handled in accordance with the court's procedure. (Doc. 217 at 14-15).   The parties did not avail themselves of the opportunity offered by the court.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution provides that:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The particularity requirement ensures that the search is as limited as possible, and was intended to prevent the wide-ranging, "exploratory rummaging" of a "general search," which the colonists abhorred. United States v. Foster, 100 F.3d 846, 849 n.3 (10th Cir. 1996) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L. Ed. 2d 564 (1971)). Government agents may only seize items that are described in the warrant, and "nothing is left to the discretion of the officer . . . ." Id. at 849.

"[T]he general rule, where executing officers exceed the scope of a warrant, is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was a flagrant disregard for the terms of the warrant." United States v. Le, 173 F.3d 1258, 1269 (10th Cir. 1999). However, when the violation may be fairly described as "flagrant," blanket suppression of all evidence seized, whether lawfully or unlawfully, may be required. Foster, 100 F.3d at 849. Although the degree of the officers' disregard for the scope of the warrant may be proved by direct evidence, see, e.g., id. at 850 (suppressing all evidence where

-7-

officer admitted that it was standard procedure in his department to ignore the warrant and seize "anything of value" when a warrant is executed), the degree of disregard may be established circumstantially by a quantitative comparison of the evidence lawfully seized to that seized unlawfully.  See United States v. Medlin, 842 F.2d 1194, 1195-96, 1199 (10th Cir. 1988) (suppressing all evidence when 130 items seized lawfully, but 667 items seized unlawfully).

Since defendants put forth no direct evidence on this matter, the court must pursue the latter course, first determining what, if any, evidence was unlawfully seized.  Then, the court will determine whether the volume of unlawfully seized evidence is so disproportionate to that which was properly seized so as to compel the conclusion that the search in question was an unlawful general search.  Where, as here, the challenged search was supported by a warrant, defendants bear the burden of proving that the search violated the Fourth Amendment.  United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994).

**A.  2001 Search was not a General Search**[3]

---

[3] Defendants assert that the search was general due to beliefs and suspicions of officers conducting the search.  They cite United States v. Foster, 100 F.3d 846 (10th Cir. 1996) in support of their argument.  Foster is distinguishable for several reasons, but one of the most telling is that the district court held a suppression hearing at which an officer admitted that "everything of value" was seized pursuant to standard department procedure, regardless of the language of the warrant.

In this case, there was no suppression hearing.  The officers who participated in the search did not testify and there is no evidence that the officers seized "everything" or anything close to "everything."  The parties' agreement regarding authenticity of documents cannot be stretched to cover officers' "beliefs" and "suspicions."

Under the heading <u>SPECIFIC ITEMS TO SEIZE</u>, the 2001 Warrant listed the items to be seized as follows:

> 1) Documents which regard procedures and policies for billing for Medicare patients, including, but not limited to, records concerning, discussing or describing the proper (or improper) way to bill services, documents to or from the Health Care Financing Administration (HCFA), Blue Cross/Blue Shield of Kansas, or any other entity which is related to or impacts on Medicare billings;
>
> 2) Documents which relate to the ownership or control of the physical or real property which is part of the premises occupied by **Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity;
>
> 3) Documents which reflect any individuals or organizations who have direct or indirect ownership or control interest in, or who have acted as a director, officer, agent, or managing employee of **Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity;
>
> 4) Accounting and financial records for **Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity;
>
> 5) Documents which relate to the disposition of any funds paid by the Social Security Administration on behalf of any beneficiary to Arlan or Linda Kaufman, or which relate to the duties and responsibilities of a representative payee;
>
> 6) Documents concerning rent paid or expenses

---

Defendants also cite <u>United States v. Tamura</u>, 694 F.2d 591 (9th Cir. 1982) for its "suggestion" that if seized items are removed for off-site review, officers can avoid problems by obtaining another warrant before reviewing the documents. A "suggestion" by a panel of the Ninth Circuit in a 20-plus year old case is not persuasive.

paid by any Social Security beneficiary who has Arlan or Linda Kaufman as their representative payee;

7) Calendar or appointment books and patient sign in sheets or logs;

8) Regardless of time period, all medical charts and records, including, but not limited to, doctors orders, progress notes, office notes, patient order forms, prescriptions, visit logs, patient ledger/payment records, laboratory test records, hospital records, billing records (including charges, payments and/or adjustments), therapy notes, contracts or agreements of any kind only for those patients identified here, and any records reflecting the fact of treatment, the dates of treatment, length of treatment, identify of the patient and the treating therapist, the time and length of each appointment, fees, diagnoses, actual treatment or interventions provided, treatment plans and recommendations, somatic therapies, and billing information related to the provision of any service for the following people: [JA, RB, KB, DB, GC, AG, HH, MH, JJ, PL, KR, TR, BT, AW][4]

9) All of the above records (Specifications 1 through 8), whether stored on paper, on magnetic media such as tape, cassette, disk, diskette or on memory storage devices such as optical disks, disks, diskettes, removable hard disk cartridges, tapes, laser disks, video cassettes, programmable instruments such as telephones, "electronic address books", calculators, or any other storage media or media capable of being read by a computer or with the aid of computer related equipment, to be printed and seized in printed form.

2001 Search Warrant attach. A (emphasis in original).  In addition to this description of the items to be seized, the warrant further circumscribed the scope of the search with these additional provisions:

---

[4] The identities of these potential victims has been redacted.

-10-

1. Unless otherwise specified, the time period referred to is **January 1, 1997** to the present and all documents dated at any time during that time period and all documents that discuss policies, business or organizational arrangements, or standard practices in effect at any time during that time period for **Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity.[5]

2. "Documents" means written, printed, typed, recorded, electronic or graphic matter of every type or description, formal or informal, whether or not wholly or partially in handwriting, including, but not limited to, agreements, contracts, orders, visit logs, billing records, payment records, financial and accounting records (such as general ledgers, subsidiary ledgers, books of accounts, journals trial balances, financial statements, bank statements, investment account statements, prospectuses and accounting worksheets) and source documents (such as checks, check stubs or registers, bank drafts, canceled checks, cashiers checks, deposit slips, withdrawal slips, orders, receipts, vouchers, invoices, manifests, bill of lading, and endorsements), appointment books or calendars, medical records or charts or any part thereof, minutes of meetings, instructions, directions, policies, notes, memoranda, correspondence, letters, marketing materials, training materials, diaries, desk pads, scrapbooks, notebooks, bulletins, circulars, forms, pamphlets, statements, postcards, letters, telegrams, facsimiles, reports, notices, messages, analysis, comparison, graph, chart, microfilm, microfiche, scanned documents, and material stored in any data storage system, to include electronic storage media.

Id.

The only evidence defendants put forth regarding the items seized during the 2001 search is an inventory generated by the

---

[5] The court notes that the second half of this compound sentence appears incomplete in that the subject is basically "all documents," but there is no verb.

government (Doc. 132 exhs. 3, 4.), along with a handful of the contested items attached as exhibits to their reply brief. (Doc. 182.) The court will consider the contents of those specific items in making its ruling; however, for other contested items which are not in evidence, the court will accept the inventory as evidence, and will consider the descriptions of seized items contained therein. Nonetheless, the descriptions are often quite general. By declining to put forth any evidence at the hearing they requested, defendants have forced the court to rely almost exclusively on the descriptions contained in the inventory. Since defendants bear the burden to prove that the challenged items were seized outside the scope of the warrant, any ambiguities in the descriptions of the seized items will be resolved against defendants. Cf. United States v. Higgins, 282 F.3d 1261, 1269 (10th Cir. 2002).

The 2001 inventory contains 405 line items. (Doc. 132 exh. 3.) Defendants claim that 205 of those items were beyond the scope of the warrant. Id. at 8-9. Defendants presented a marked-up copy of the 2001 inventory on which they drew colored boxes around the contested items, each of the four colors used designating a different group for purposes of their argument.[6] Id. exh. 4. While defendants have seen fit to speak in generalities on this matter, the court can see no way to resolve this dispute except by

_____

[6] In fact, defendants used five different colors to group the disputed items - red, yellow, blue, orange, and black. Unfortunately, defendants only discussed four of the color groups, leaving the court to wonder about the significance of items circled in orange. (Docs. 132 at 9-10; 182 at 2-10.) Nonetheless, the court considered items circled in orange and addresses them below.

going through the contested items one-by-one.  Nonetheless, some items merit more discussion than others.  Accordingly, rather than write 205 paragraphs, one for each item, the court will address the many meritless challenges summarily, in tabular form.  In arriving at its conclusion that these items clearly fall within the scope of the warrant, the court relies on the descriptions included for each line item in the 2001 inventory, rather than the abbreviated description included in the table, <u>infra</u>.

Before commencing its line-by-line review, the court needs to address one argument put forth by defendants that bears heavily on determining which items fall within the scope of the warrant.  Under the heading "<u>SPECIFIC ITEMS TO SEIZE</u>," the 2001 warrant repeatedly uses the following phrase to limit the scope of items to be seized: "**Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity." (Emphasis in original).  Defendants interpret this phrase to limit the search to business-related items belonging to Arlan Kaufman, whether in his own name or in the name of one of the businesses.  (Docs. 132 at 6; 182 at 2, 5-6.)  By contrast, the government implicitly interprets this language as authorizing seizure of items related to defendant Arlan Kaufman, whether personally or in relation to the two business entities specified.  (Doc. 160 at 22.)  The court rejects defendants' interpretation.  The scope of this language is made clear in the last part of the phrase, where it states, "whether individually or as an entity."  These words make clear that the warrant authorized seizure of items related to Arlan Kaufman, both as an individual

-13-

and through his businesses, the Kaufman Treatment Center or the Kaufman House Residential Group Treatment Center, Inc. Hence, items that were personal to Arlan Kaufman and wholly unrelated to his businesses would still fall within the scope of the warrant.

**1. Summary of Items Properly Seized Under 2001 Warrant**

The following table summarizes the court's findings with respect to the bulk of the property seized pursuant to the 2001 Warrant:

| Item No.[7] | Description | Search Warrant Category[8] |
|---|---|---|
| 1.01 | Tax records | 4 |
| 1.03 | Telephone bills | 2, 4 |
| 1.05 | Medical bills and insurance information | 4 |
| 1.06 | Farm receipts and invoices | 4 |
| 1.07 | Receipts and invoices | 4 |
| 1.08 | Tax guide book | 4 |
| 1.09 | Tax publication | 4 |
| 1.11 | Notebook labeled 1998 taxes | 4 |
| 1.13 | Credit card statements | 4 |
| 1.14 | Financial records | 4 |
| 1.15 | Receipts | 4 |
| 1.16 | Bank statements | 4 |
| 1.17 | Bank statements | 4 |
| 1.18 | Bank statements | 4 |

---

[7] This is the same numbering scheme used on the 2001 inventory.

[8] The numbers in this column correspond to the paragraph number(s) in the 2001 search warrant, under the heading "SPECIFIC ITEMS TO SEIZE," which authorized seizure of this particular item. See pages 8-11, supra.

-14-

| | | |
|---|---|---|
| 1.19 | Bank statements | 4 |
| 1.20 | Bank statements | 4 |
| 1.21 | Bank statements | 4 |
| 1.22 | Bank statements | 4 |
| 1.23 | Bank statements | 4 |
| 1.24 | Bank statements | 4 |
| 1.25 | Bank statements | 4 |
| 1.26 | Bank statements | 4 |
| 1.27 | Bank statements | 4 |
| 1.28 | Bank statements | 4 |
| 2.02 | W-2s and ledger sheets | 4 |
| 2.04 | Unsigned prenuptial agreement | 4 |
| 2.05 | Tax book | 4 |
| 2.06 | Tax forms and publications | 4 |
| 2.07 | Insurance premium information | 4 |
| 2.09 | Tax records | 4 |
| 2.10 | Invoices and receipts | 4 |
| 2.11 | Receipts and credit card statements | 4 |
| 2.13 | Financial records | 4 |
| 2.16 | Bank statements | 4 |
| 2.17 | Bank statements | 4 |
| 2.18 | Bank statements | 4 |
| 2.19 | Bank statements | 4 |
| 2.20 | Bank statements | 4 |
| 2.21 | Bank statements | 4 |
| 2.22 | Bank statements | 4 |
| 2.23 | Bank statements | 4 |
| 2.24 | Bank statements | 4 |
| 2.25 | Bank statements | 4 |

| 2.26 | Bank statements | 4 |
|------|-----------------|---|
| 2.27 | Bank statements | 4 |
| 3.01 | Account statements | 4 |
| 3.06 | Receipts | 4 |
| 3.07 | Receipts | 4 |
| 4.01 | Patient notes and records for JJ | 8 |
| 5.02 | Bank statements | 4 |
| 5.03 | Bank statements | 4 |
| 5.04 | Social Security records | 4 |
| 5.05 | IRA records | 4 |
| 5.07 | Medical bills | 4 |
| 5.09 | Retirement account records | 4 |
| 5.11 | IRA records | 4 |
| 5.12 | Credit card records | 4 |
| 5.14 | IRA records | 4 |
| 5.17 | IRA records | 4 |
| 5.19 | Tax records | 4 |
| 5.21 | Tax records | 4 |
| 5.22 | Bank statements | 4 |
| 5.23 | Tax records | 4 |
| 5.24 | Continuing education materials regarding billing procedures | 1 |
| 5.25 | IRA records | 4 |
| 5.28 | Receipts | 2, 4 |
| 5.29 | Financial records | 4 |
| 5.30 | Tax records | 4 |
| 5.31 | Tax records | 4 |
| 5.32 | Tax records | 4 |
| 5.33 | Medical bills | 4 |
| 5.35 | Credit card records | 4 |

| 5.37 | Check registers | 4 |
|------|-----------------|---|
| 5.41 | Tax records | 4 |
| 5.43 | Bank statements | 4 |
| 5.44 | Bank statements | 4 |
| 5.45 | Bank statements | 4 |
| 5.46 | Bank statements | 4 |
| 6.06 | Receipts | 4 |
| 6.07 | Bank statements | 4 |
| 6.08 | Farm receipts | 2, 4 |
| 6.09 | Medical receipts | 4 |
| 6.13 | Bank statements | 4 |
| 6.14 | Mutual fund records | 4 |
| 6.15 | Insurance records | 4 |
| 6.16 | Tax records | 4 |
| 6.17 | Receipts | 4 |
| 6.19 | Investment records | 4 |
| 6.21 | Tax records | 4 |
| 6.22 | Receipts | 4 |
| 8.01 | Investment records | 4 |
| 8.03 | Patient vacation plans | 5, 6, 8 |
| 8.34 | Tax records | 4 |
| 8.35 | Tax records | 4 |
| 8.36 | Tax records | 4 |
| 8.37 | Tax records | 4 |
| 9.04 | Nude therapy literature | 8 |
| 9.08 | Notes and calculations regarding farm | 2, 4 |
| 9.11 | Therapy notes | 8 |
| 13 | Video tape of sex therapy | 8 |
| 23 | Handwritten note regard nude therapy | 8 |

| 25 | Real estate/Insurance papers for 1416 Grandview | 2 |
| 27 | Patient waivers | 5, 6, 8 |
| 32 | Patient notes | 8 |
| 42.06 | Letter regarding JJ's condition | 8 |
| 44.01 | Bank statements | 4 |
| 44.16 | Telephone statements | 2, 4 |
| 46.15 | Receipts | 4 |

### 2. Additional Items Properly Seized Under 2001 Warrant

Turning now to contested items that merit additional discussion, defendants used the color yellow to designate video tapes and photographs containing nude people or sexually explicit material, which defendants argue are beyond the scope of the 2001 warrant. However, it is uncontested that defendants claim their nude therapy is a legitimate method of treating the mentally ill patients under their charge. Accordingly, the court finds the following items represent photographs or videos of defendants and or their patients engaged in nude and/or sexually explicit activities that represent the sort of "treatment" defendants provided, and were therefore properly seized under paragraph 8 of the 2001 search warrant's list of items to be seized: 14.03, 14.05, 24, all items under 33, 37.01, 38.01, 38.02, 38.03, 38.04, 38.05, 38.08, 38.42, 38.52, 41.01, 41.02, 41.05, 43.02, 43.07, 43.08, 43.09, and 44.06.

Similarly, the government also seized other literature, photographs and video tapes of nudist or sexually explicit material that do not appear to contain images of defendants or their

-18-

patients.   Nonetheless, the descriptions in the search warrant inventory suggest that these materials may represent the types of activities that defendants considered therapeutic, and for which they billed Medicare.  Accordingly, the court concludes that they were properly seized under paragraph 8 of the 2001 search warrant's description of items to be seized, as evidence of, among other things, "actual treatment or interventions provided, treatment plans and recommendations, [and/or] somatic therapies."   2001 Search Warrant, Specific Items to Seize ¶ 8.  Thus, the following items were properly seized: 37.02, 38.31, 38.32, 38.33, 38.34, 38.35, 38.36, 38.37, 38.38, 38.39, 38.40, 38.41, 38.43, 38.45, 38.50, 39, 40, and 43.04.

In addition to the foregoing subsets of yellow items, there are a few that do not fit into neat categories.  Item 38.21 is a video tape discussing patient residential facilities.  This could constitute general evidence related to treatment and services provided to the patients, and was properly seized under paragraphs 5, 6, and 8 of the 2001 search warrant's description of items to be seized.  Item 38.49 is described as a videotape showing defendant Arlan Kaufman and two patients comparing independent living arrangements to the lifestyle associated with living at an institution.  This tape was properly seized under paragraphs 5, 6, and 8 of the warrant.  Finally, item 43.10 is a video tape that shows resident BT discussing legal issues with defendant Arlan Kaufman.  Among other things, a tape of this type would provide evidence of BT's progress while under defendants' care in the sense that it memorializes her mental state and intellectual capacity at

-19-

a given point in time, and was thus properly seized under paragraph 8.

Besides the yellow items, defendants also designated several contested items with the color black.  The items are computer files printed from defendants' computer during the 2001 search. Defendants first argue that the entire computer search was unlawful because officers failed to take the steps set forth in United States v. Carey, 172 F.3d 1268 (10th Cir. 1999) and United States v. Campos, 221 F.3d 1143 (10th Cir. 2000) when they discovered relevant files intermingled with irrelevant files.  (Doc. 132 at 21-23.)  However, defendants declined to put forth any evidence that the computer files were mingled in this fashion.  Moreover, their representations in their brief were misleading on this point. Defendants charged that SA Filson searched the computer unlawfully. However, the evidence at the hearing was that SA Filson had no part in searching defendants' computer.   Rather, that task was undertaken by other officers.  Thus, based on defendants' failure to show that irrelevant files were intermingled with relevant files, coupled with their misrepresentations on this matter, the court finds nothing improper about the search method employed.

That conclusion notwithstanding, defendants also assert that 12 of the 25 files seized were outside the scope of the warrant. Defendants included copies of most of the contested files as exhibits to their reply brief.  (Doc. 182.)  The court has reviewed those exhibits.  Item 48.03 contains therapy notes and information regarding Medicare billing for treatment to resident RB, thereby bringing this file within the scope of paragraphs 1, 4, and 8 of

the 2001 warrant.  Defendants concede as much.  (Doc. 182 at 8.)
Items 48.06 and 48.07 discuss nude therapy, the nudist proclivities
of defendants' patients, and other activities at defendants' farm,
and was properly seized under paragraph 8.

Item 48.08 discusses arrangements for a vacation trip to
Florida in which defendants express an intent to take patients
along with them in exchange for labor on their farm.  The
government asserts that defendants billed Medicare for "therapy"
that occurred during the dates of this trip.  Thus, evidence about
the trip is encompassed under paragraph 8 of the 2001 search
warrant.  Moreover, if defendants billed Medicare for events on
this trip, and then tried to exact duplicative payment from the
patients, this evidence would appear to be central to the
government's case.  Finally, defendants have made clear that they
consider the work done on the farm to be part of the therapy they
provided to their patients, thereby once again implicating
paragraph 8 of the 2001 search warrant.  In addition, this item
also contains a memorandum identifying one of the "attractions"
that defendants suggested to their patients for the Florida trip
as being a nudist resort.  The memorandum, purportedly written by
defendant Arlan Kaufman, also yields insight into his view of
nudism as a legitimate means of treating mental problems, thereby
placing it squarely within paragraph 8.

Item 48.11 discusses another trip to Colorado.  Taken in
context with other evidence showing that defendants took patients
with them on this trip, along with evidence such as item 48.08
showing that defendants were inclined to exact some sort of payment

in the form of farm labor for such trips, this item was properly seized as evidence relating to therapy under paragraph 8 of the 2001 search warrant.  Moreover, this document provides a somewhat detailed look into the mental impression of various patients during this trip.  It also documents the fact that having the patients engage in nude activities was a planned element of the "vacation."

Items 48.14 and 48.16 include notes and agreements regarding resident MH, along with other information regarding the type of "therapy" defendants supplied to their patients.  Item 48.20 contains rules and policies for the Kaufman House.  Item 48.21 contains notes on a particular type of therapy.  Item 48.22 contains notes and forms regarding treatment and living arrangements for the patients.  Item 48.25 contains notes regarding the therapy and living arrangements at the Kaufman House.  All of these items were properly seized under paragraph 8 of the 2001 search warrant.

Finally, item 48.24 discusses the billing questions raised by BCBSKS, along with the interactions between defendants, the BCBSKS representative, and Medicare.  It also contains letters regarding patients.  This item was properly seized under paragraphs 1 and 8 of the 2001 search warrant.

Next, the court considers a number of items related to one of the residents, BT.  Item 8.19 contains a document appointing defendant Arlan Kaufman as BT's guardian.  Item 8.26 also purports to discuss Arlan Kaufman's actions as BT's guardian.  In this capacity, Arlan Kaufman would likely be responsible for receiving

-22-

and disbursing funds on behalf of BT, activities clearly encompassed by paragraphs 5 and 6 of the 2001 search warrant. It is also conceivable that the guardianship documents may discuss the relationship between BT and Arlan Kaufman, as well as the fact of treatment being rendered by defendants to BT, all matters within the scope of paragraph 8 of the 2001 search warrant. Hence, these items were properly seized.

Item 8.25 contains tax records for BT. Tax records may shed light on defendants' handling of BT's funds, including items addressed in paragraphs 5 and 6 of the warrant. Thus, 8.25 was properly seized. Items 8.27, 8.29, and 8.30 appear to contain medical bills and related statements for BT. Such items provide evidence regarding BT's medical condition, a matter within the scope of paragraph 8. Finally, item 8.32 purports to contain cards and letters related to BT. To the extent these documents provide a glimpse into BT's medical condition, particularly her mental health condition, they were properly seized under paragraph 8 of the 2001 warrant. Even the cards and letters have the potential to show BT's coherence and mental condition over time. As such, they were properly seized as well.

Next, the government seized a number of documents related to IRAs in the name of defendant Linda Kaufman: Items 5.06, 5.10, 5.13, 5.15, 5.16, and 6.20. The government asserts that all of these documents were seized under paragraph 4 of the 2001 search warrant. (Doc. 160 at 28-29.) However, that paragraph authorized seizure of "[a]ccounting and financial records for **Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group**

**Treatment Center, Inc.** - whether individually or as an entity."
(Emphasis in original).  As previously discussed, this language
allowed the government to reach Arlan Kaufman's financial records.
By contrast, the court finds no basis to construe this paragraph
as reaching financial records related exclusively to Linda Kaufman,
individually.  The 2001 inventory makes no suggestion that these
particular records were commingled with those of Arlan Kaufman, nor
that the funds referenced therein were commingled with those of
Arlan Kaufman.  Based on this scant record, the aforementioned
items were outside the scope of paragraph 4.

Alternatively, the government asserts that these items were
seized pursuant to paragraphs 5, 6, and the billing portion of
paragraph 8.  (Doc. 160 at 28-29.)  Paragraph 5 authorizes seizure
of documents related to disposition of funds received from the
Social Security Administration.  Although it is unlikely that
statements from the IRAs would indicate the source of funds related
to any particular deposit, it is possible for the government to
show, through circumstantial evidence, that checks for Social
Security benefits in specific amounts were cashed or deposited in
other institutions and then deposits for equal amounts were made
into Linda Kaufman's IRAs, thereby tracing misappropriated funds
to the IRAs.

Likewise, essentially the same analysis applies to paragraph
6 of the 2001 warrant, which authorizes seizure of documents
"concerning rent paid or expenses paid by any Social Security
beneficiary who has Arlan or Linda Kaufman as their representative
payee."  The government could trace funds from one of the Social

-24-

Security beneficiaries to Linda Kaufman's IRA.  Accordingly, for all these reasons, the court finds that these items were properly seized.

Last of all, with respect to items properly seized, there are four miscellaneous items that do not fit well into any of the previous groupings.  Item 9.01 is a spiral notebook containing the writings of MH.  Like BT's writings in item 8.32, this notebook provides a potential glimpse at the mental state of the author, resident MH.  In that regard, it was properly seized under paragraph 8 as evidence of MH's treatment progress.  Item 9.21 is described as a spiral notebook containing a letter regarding nudity.  Since defendants maintain that nudity is part-and-parcel of their therapy, this item was properly seized under paragraph 8.  Item 18 contains medical billing information for BT and GC, information encompassed by paragraph 8 of the 2001 search warrant.  Item 21 is described as "[t]ext of Kansas House Bill #2213 concerning patient confidentiality; document titled legal issues related to KBSRB subpoena of records."  The government asserts that this item also contained numerous Medicare documents, which are covered under paragraph 1 of the warrant.  However, the only evidence before the court is the above-quoted description from the 2001 inventory.  Nonetheless, the 2001 search warrant affidavit makes clear that the KBSRB investigation touched on defendants' Medicare billing practices.  2001 Search Warrant Aff. at 11.  Accordingly, the court finds that item 21 was properly seized under paragraph 1 of the 2001 warrant.

**3.   Items Improperly Seized Under 2001 Warrant**

-25-

Although the preceding discussion focused on contested items that were properly seized, the court finds that some items were improperly seized because they were beyond the scope of the warrant.[9] The court makes this determination based on the evidence provided by the parties, which consists mostly of the 2001 inventory. (Doc. 132 exh. 4.) Although the government was offered an opportunity to put on evidence at the hearing, it declined to do so. Having made that decision, the government is left with little more than the descriptions of the evidence contained in the 2001 inventory.

Item 5.08 is described as medical records for Linda Kaufman. As it did regarding Linda Kaufman's IRAs, the government asserts that these records were properly seized under paragraphs 4, 5, 6, and 8 of the 2001 search warrant. (Doc. 160 at 28-29.) However, unlike the IRAs, through which purloined funds might have been funneled, the court fails to see how Linda Kaufman's medical records fall within any of the four paragraphs on which the government relies. They are not financial records, nor do they constitute any obvious link in the chain of disposition of Social Security funds. Neither can they be fairly described as amounting

---

[9] The court does not consider whether the government should have recognized that these items were beyond the scope of the warrant at the time they were initially seized. The Tenth Circuit has recognized that in some cases the government may seize complex or voluminous documents for further review off-site. United States v. Hargus, 128 F.3d 1358, 1363 (10th Cir. 1997). Since we are now over four years from the date the search was conducted, the court simply finds that at some point during its required evaluation of the seized evidence the government should have recognized that these few items were beyond the scope of the warrant and acted accordingly.

to billing records for defendants' patients.  Therefore, the court finds that this item was outside the scope of the warrant.

Item 6.10 is described as a blank ledger book.  The government merely notes it as a ledger and claims that it was properly seized as financial a record.  A blank ledger is not a financial record.  This item was outside the scope of the 2001 warrant.

Item 22.02 is described as a spiral notebook, with the first name of a patient written on the front, but otherwise containing notes about legal issues and social worker confidentiality that were apparently gleaned from some sort of seminar.  The government claims that this item was properly seized under paragraphs 5, 6, and 8 because it referenced JA.  However, the only reference to JA noted in the inventory is the mere labeling of the notebook.  There is not the slightest hint that the contents are anything other than generic seminar notes.  Since paragraphs 5, 6, and 8 deal specifically with patients and Social Security beneficiaries, the court finds no basis to conclude that this item came within the scope of those warrant provisions.

Item 38.51 is described as a video tape containing religious programming.  The government makes a general argument that most of the video tapes and photographs pertain to nude therapy or related topics, and were thus seized under paragraph 8.  However, the description of this video does not comport with that generalization.  The court finds that a movie described only as containing religious programming does not fall within the scope of the warrant.  Likewise, item 43.05 is described as a video tape containing "television specials."  The preceding analysis of item

-27-

38.51 applies with equal force to this item.  It was not properly seized under the warrant.  Finally, the government concedes that three additional items were improperly seized: Items 38.30, 38.47, and 41.03.  (Doc. 160 at 34.)

In sum, of the 405 items seized, defendants have met their burden to show that only eight items were outside the scope of the 2001 warrant.  Defendants have put forth no direct evidence to show that government agents flagrantly disregarded the warrant so as to convert the search into an unlawful general search.[10]  See Foster, 100 F.3d at 849-50.  Likewise, defendants have failed to build a circumstantial case for a general search based on the relative number of items unlawfully seized as compared to those properly seized.  Medlin, 842 F.2d at 1195-96, 1199.  Accordingly, the appropriate result is not the "unusual" and "extreme remedy" of blanket suppression, Le, 173 F.3d at 1269, 1270, but the normal remedy of suppressing only those items that were outside the scope of the warrant.  Id. at 1269.

**B.  The 2001 Search Warrant was Sufficiently Particular**

Defendants next argue that if the 2001 Search Warrant authorized seizure of the bulk of the 405 items seized, then it was necessarily overbroad.  (Doc. 132 at 19-20.)  In support of that argument, they cite only one case, and make no effort to provide any analysis of the legal tests defining overbreadth.  Instead,

---

[10] This conclusion forecloses defendants' additional argument regarding improper procedures for sorting and reviewing documents off-site.  (Doc. 132 at 15-18.)  Since over 98% of all items seized were within the scope of the warrant, defendants have no basis to complain about the intrusion occasioned by the large number of documents and other items that were taken.

they merely supplement their scant evidentiary record with bombastic rhetoric. This approach is not helpful, nor is it effective.

The key word around which defendants' argument should be based is "particularity." U.S. Const. Amend. IV. That word is strikingly absent from defendants' argument.

> [A] warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Finnigin, 113 F.3d 1182, 1187 (10th Cir. 1997) (omitting quotations and citations). Further, the warrant must leave nothing to the officer's discretion as to what is to be seized, so that the officer is prevented from generally rummaging through a person's belongings. See Lawmaster v. Ward, 125 F.3d 1341, 1347-48 (10th Cir. 1997).

United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997). The scope of a warrant is sufficiently limited to satisfy constitutional concerns when it

> "allow[s] the executing officers to distinguish between items that may and may not be seized." Finnigin, 113 F.3d at 1187 (quoting United States v. Leary, 846 F.2d 592, 602 (10th Cir. 1988)). "Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." Davis [v. Gracey], 111 F.3d [1472,] 1478 [10th Cir. 1997] (internal quotations omitted).

Id. at 1362-63.

The scope of the 2001 warrant was limited in a number of ways. The warrant limited the seizure of most documents to those that were dated between January 1, 1997 and the date of the search. 2001 Search Warrant attach. A at 2 ¶ 1. Under paragraphs 2, 3, and

4 of the description of items to be seized, the warrant limited the scope of seizure to various documents and records related to "**Arlan Kaufman, d/b/a Kaufman Treatment Center or Kaufman House Residential Group Treatment Center, Inc.** - whether individually or as an entity." (Emphasis in original). As the court has already ruled, this excluded some documents related only to Linda Kaufman, and would likewise exclude documents related exclusively to any person or entity other than Arlan Kaufman and his specified businesses. Finally, under paragraph 8 of the description of items to be seized, the warrant limits seizure to those documents that relate in some way to treatment and the medical conditions of specified patients.

Noting that the focus of the warrant was various methods of complex fraud, along with accompanying accusations of false statements, the court finds that the warrant was sufficiently specific to satisfy the particularity requirements. 2001 Search Warrant Aff. at 17-18. Fraud ordinarily implies an intent to hide one's deceptive practices. In order to properly investigate a health care fraud case, it is understandable that the government would need an abundance of documents that show treatment given, treatment billed, patients' medical conditions, and the trail of the money flowing into and out of the hands of the alleged perpetrators. Cf. Andresen v. Maryland, 427 U.S. 463, 481 n.10, 96 S. Ct. 2737, 2748, 49 L. Ed. 2d 627 (1976). Therefore the court rejects defendants' argument that the 2001 warrant lacked the particularity required by the Fourth Amendment. Furthermore, finding both that the 2001 search was not a general search and that

-30-

the 2001 warrant was sufficiently particular, the entire basis to suppress the evidence from the 2004 and 2005 searches as fruits of the "illegal" 2001 search is non-existent. (Doc. 132 at 23.)  That argument is likewise rejected.

**C.  The 2004 Search Warrant**

As their last basis for suppressing evidence, defendants argue that the 2004 search warrant was also too broad.  (Doc. 132 at 24.)  This warrant authorized seizure of the following items:

> 1) All documents and other items related to or concerning individuals who are or who have been residents of the Kaufman House, including but not limited to:
>> a) All medical files, charts, or notes, including but not limited to nursing notes and medication distribution records, concerning past or present residents of the Kaufman House.
>> b) All notes, records, or other documents concerning the social history, therapy, counseling, education, treatment, progress, or examination of any resident of the Kaufman House.
>> c) All documents, including calendars, notes, diaries, journals, letters, and other records, created by any past or present resident of the Kaufman House.
>
> 2) All documents and other items concerning guidelines, rules, suggestions, or recommendations of appropriate behavior at the Kaufman House.
>
> 3) All financial records, including but not limited to bank records and credit card records related to the operation of the Kaufman House and the income of Arlan Kaufman and/or Linda Kaufman.
>
> 4) All documents, including calendars, notes, diaries, journals, and other records of activity, that were created by or maintained by Arlan Kaufman and/or Linda Kaufman concerning

-31-

activity involving residents of the Kaufman House.

5) All documents related to any research project or study being conducted by Arlan Kaufman and/or Linda Kaufman.

6) All text books, course materials, charts, notes, or other education documents concerning issues related to nursing, therapy, social work, psychology, or psychiatry.

7) All correspondence by Arlan Kaufman and/or Linda Kaufman concerning activity by past or present residents of the Kaufman House.

8) All correspondence addressed to Arlan Kaufman, Linda Kaufman, or the Kaufman House concerning the distribution, sale, viewing, or accessibility of video tapes and/or photographs of past or present residents of the Kaufman House.

9) All other documents that were designed for use or actually used in connection with counseling, education, and/or therapy provided at the Kaufman House.

10) All computers, hard drives, disks, CD's, and other storage devices maintained in any of the Kaufman properties.

11) All video tapes and audio tapes maintained in any of the Kaufman properties, including but not limited to video tapes containing images of past or present residents of the Kaufman House, video tapes containing images of unclothed or partially clothed individuals, video tapes that include images or content related to nudism and or sexual activity, and "Naturist Video Tapes."

12) All video cameras and accessories maintained in the Kaufman properties.

13) All photographs including but not limited to photographs containing images of past or present residents of the Kaufman House, photographs containing images of unclothed or partially clothed individuals, and photographs that include images related to nudism and or sexual activity.

14) All cameras and accessories.

-32-

15) All stun guns or other shock devices.

16) All other items that were designed for use or actually used in connection with counseling, education, and/or therapy provided at the Kaufman House.

2004 Search Warrant Attach. A.  Defendants argue that paragraphs one, three, ten, and thirteen rendered the warrant overly broad, and thus it failed to satisfy the Fourth Amendment's particularity requirement.  (Doc. 132 at 24.)

Defendants rely on United States v. Leary, 846 F.2d 592 (10th Cir. 1998) for its propositions regarding a warrant's lack of particularity.  (Docs. 132 at 25; 182 at 15-16.)  While Leary is still good law, the wording in the Leary search warrant that led to its undoing was much different than that contained in the 2004 warrant.  The Leary warrant authorized seizure of

> [c]orrespondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of the Arms Export Control Act, 22 U.S.C. 2778, and the Export Administration Act of 1979, 50 U.S.C. App. 2410.

Leary, 846 F.2d at 594 (emphasis added).  The court of appeals found this provision unconstitutionally overbroad based on the fact that it allowed the search of an export business for virtually any document related to generalized statutes that prohibited unlawful exports.  Id. at 600-03; see also United States v. Wicks, 995 F.2d 964, 974 n.6 (10th Cir. 1993) (similarly characterizing the holding in Leary).  Thus, the Leary warrant was deficient because the scope of the search was limited only by reference to two broad,

-33-

generalized, criminal statutes addressing export laws.  Moreover, the scope of the warrant was further expanded by the fact that the warrant required only that the things to be seized be "related to" either of those statutes.  _Id._ at 594.  _Leary_ found that this language imposed essentially no limits on the search, since the target of the search was, in fact, an export company.  _Id._ at 601, 602 ("The warrant encompassed virtually every document that one might expect to find in a modern export company's office").  This was especially so since the government had evidence that would have allowed it to narrow the scope of the warrant to focus on exports of particular types of items to a particular company.  _Id._ at 604.

In contrast to the _Leary_ warrant, the 2004 warrant did not rely on a statute.  Although the affidavit enumerated several statutes, the contents of the affidavit can only be considered in evaluating the particularity of the warrant if two requirements are met: "first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference." _Id._ at 603.  As defendants are so quick to point out, there is no evidence that either condition was met here.  (Doc. 182 at 15-16.) Accordingly, the warrant must stand or fall by its own terms.

Admittedly, the government's handling of the warrant has left something to be desired.  By not attaching the affidavit to the warrant and incorporating the affidavit by reference into the warrant, as was apparently done with the 2001 affidavit and warrant (Doc. 160 at 4), the government gave up the opportunity to rely on

-34-

the amalgamated document in order to avoid any problems of particularity.   In order to mitigate the apparent problems raised in defendants' brief, the government argues that any deficiencies in the warrant should be cured by the affiant's presence during the search.  (Doc. 160 at 17-18.)  In so arguing, the government relies on United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999).  Id. Guidry held that the good-faith exception of United States v. Leon, 468 U.S. 897, 925, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) saved an arguably overbroad warrant when the executing officer had been intimately involved in the investigation prior to executing the warrant such that his knowledge of the crimes involved acted to limit the scope of the search.  Guidry, 199 F.3d at 1155.  The court will reach the good-faith exception, infra, but for now the focus is on the particularity of the warrant; thus, the government's reliance on Guidry is misplaced.

"The fourth amendment requires not only that the warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search." Leary, 846 F.2d at 605.  Defendants argue that the 2004 warrant failed to satisfy either requirement.  (Doc. 132 at 25-26.)

The first disputed provision of the warrant authorizes seizure of all documents and other items related to past and present residents of the Kaufman House.  By its own terms, this provision limits seizure to documents and other items related to a narrow class of individuals.  Moreover, the connection between this provision and the crimes under investigation is quite clear.  Among

other things, defendants were suspected of pressing their allegedly mentally-ill patients into involuntary servitude and compelling them to perform for the creation of sexually explicit video tapes that defendants sought to use for commercial gain, thereby violating 18 U.S.C. §§ 1584, 1589, and 1591.  Obtaining the records described in paragraph 1 would not only help identify additional victims, but would relate to whether the patients were acting of their own free will or whether they were being coerced or manipulated into performing for defendants.  Furthermore, given their allegedly questionable mental status,[11] such information might bear heavily on their capacity to consent and whether their will was potentially overborne by coercion, deception or other methods. Evidence seized under the 2001 warrant showed that defendants kept a considerable amount of documentation on these individuals.  This documentation included writings made by the patients and notes kept by defendants, as well as video tapes, audio tapes, photographs, and medical records from other treating sources.  In light of the crimes under investigation, the warrant was sufficiently particular based on the fact that it was limited to a narrow class of individuals, past and present residents of the Kaufman House.

The next provision to which defendants object is the paragraph

---

[11] The government points out that defendants' characterization of the alleged victims' mental status varies according to the nature of their testimony; i.e. the alleged victim will be a competent witness if his or her testimony is favorable to defendants, whereas a "victim" who gives unfavorable testimony has severe mental problems which will preclude his or her testimony at trial.  While this issue will not be discussed in this Memorandum and Order, it is obvious that any witness must have the requisite ability to understand the significance of the oath and his or her obligation to testify truthfully.

authorizing seizure of all financial records related to the Kaufman House and defendants' income.  The government asserts that since the Kaufman House was essentially defendants' only source of income for decades, any monetary gains from enslaving their patients would be fruits of defendants' crimes.  (Doc. 160 at 22.)  Indeed, since the crimes under investigation related to involuntary servitude and creating video tapes for commercial gain, identifying the fruits of such an operation would be appropriate if the warrant established fair probability to believe evidence of such a crime would be found at defendants' residence.  See United States v. Simpson, 152 F.3d 1241, 1246 (10th Cir. 1998).  Since there is no question that the warrant provided probable cause to search for evidence of the alleged crimes, then there was probable cause to search for the fruits of those ventures as well.  Zurcher v. Stanford Daily, 436 U.S. 547, 554, 98 S. Ct. 1970, 1975, 56 L. Ed. 2d 525 (1978).  This provision authorized seizure of a specific class of records related to specific persons - defendants and their business.  It was sufficiently particular to satisfy the Fourth Amendment.

Next, defendants attack paragraph 10 of the description of items to be seized, which authorized seizure of all their computers and related storage devices.  By its own terms, this paragraph is quite particular.  The only real question is whether there is a nexus to the crimes under investigation.  As the 2001 search showed, defendants kept notes and documents on their computers related to the patients.  Some of those documents even revealed defendants' representations to third parties that the patients were

-37-

voluntarily experimenting with social nudism and that videos of them might be available for distribution. (Doc. 182 exh. 9.) Accordingly, there can be little doubt that a strong nexus existed between these computers and the crimes under investigation. Finally, it is undisputed that the government sought separate warrants to search the contents of the computers. See, e.g., 2005 Search Warrant. Paragraph 10 was sufficiently particular to pass constitutional muster.

Last of all, defendants challenge the warrant's authorization to seize all video tapes, audio tapes, and photographs at any of the Kaufman properties. The relevant language authorizes seizure of "[a]ll video tapes and audio tapes maintained in any of the Kaufman properties, including but not limited to [those depicting patients, nudity, or sexual activity]," and "[a]ll photographs including but not limited to [those depicting patients, nudity, or sexual activity]." 2004 Search Warrant attach. A ¶¶ 11, 13. Read literally, these provisions authorized seizure of every video tape, audio tape, and photograph on the premises, from Mary Poppins to grade-school photos.

The government argues that, although the language in the warrant lacks sufficient particularity, this deficiency is cured by the affidavit and the manner in which the warrant was executed. However, as discussed supra, the affidavit was not attached to the warrant; thus, the affidavit cannot be considered in deciding whether the warrant was overly broad. Likewise, the manner of execution becomes relevant only as to the good-faith exception. Guidry, 199 F.3d at 1155.

The problem with these two paragraphs is not that the language is too vague - video tapes and photographs is fairly precise; rather, the problem is that there was no probable cause to seize all such items.  Leary, 846 F.2d at 605.  Nevertheless, there was clearly probable cause to seize tapes and photographs showing past or former Kaufman House residents, nudity, or sexual activity. Moreover, defendants have failed to put forth any evidence that tapes and/or photographs beyond this limited scope were actually seized.  Thus, the problem may be academic.

Be that as it may, out of an abundance of caution, the court finds that paragraphs 11 and 13 of the 2004 Search Warrant lacked sufficient particularity to satisfy the Fourth Amendment because they allowed seizure of all tapes and photographs on the premises, and because there was no probable cause to believe that all such items were related to the crimes under investigation.[12]  With respect to the remedy for such a violation, the court relies on United States v. Brown, 984 F.2d 1074 (10th Cir. 1993):

> At issue in this case is the effect of the language in each of the two warrants quoted in part above (Warrants I and II).  Each of these warrants described, with specificity, some items to be searched or seized, but added an

---

[12] The government's Leon good-faith exception argument is also rejected.  In fact, the government implicitly concedes that the language of these paragraphs was overly broad when it argues that the affidavit and the manner of execution act to cure the deficiency.  (Doc. 160 at 17.)  Moreover, the court finds that no reasonably well trained officer would have believed that it was appropriate to seize all photographs, video tapes, and audio tapes based on this warrant.  It is clear from the warrant, the affidavit, and the government's brief that everyone knew the focus of the warrant was tapes and photos related to the residents and/or nudity.  Unfortunately, the warrant simply was not drafted in such a way as to incorporate those limitations.

authorization to search or seize other items which the officers determined or reasonably believed to be stolen. Mr. Brown argues that this language renders the warrant unconstitutionally broad.

We find United States v. LeBron, 729 F.2d 533 (8th Cir. 1984) instructive. There, a warrant authorized a search for a list of specific items as well as for "other property, description unknown, for which there exists probable cause to believe it to be stolen." Id. at 536. That language, the court found, was not descriptive and did not adequately limit the discretion of the officers. Id. at 536. The instant warrant contained language very similar to the LeBron warrant.

However, as in LeBron, the questionable portion of the warrant may be severed. "'[T]he infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant . . ., but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized-on plain view grounds, for example-during their execution).'" LeBron, 729 F.2d at 537 n.2 (quoting United States v. Fitzgerald, 724 F.2d 633, 637 (8th Cir. 1983) (en banc), cert. denied, 466 U.S. 950, 104 S. Ct. 2151, 80 L. Ed. 2d 538 (1984)). At least eight circuits have held that where a warrant contains both specific as well as unconstitutionally broad language, the broad portion may be redacted and the balance of the warrant considered valid. See United States v. George, 975 F.2d 72, 79 (2d Cir. 1992); United States v. Blakeney, 942 F.2d 1001, 1027 (6th Cir. 1991), cert. denied, 502 U.S. 1035, 112 S. Ct. 881, 116 L. Ed. 2d 785 (1992); United States v. Holzman, 871 F.2d 1496, 1510 (9th Cir. 1989); Fitzgerald, 724 F.2d at 636-37; United States v. Riggs, 690 F.2d 298, 300 (1st Cir. 1982); United States v. Christine, 687 F.2d 749, 759-60 (3d Cir. 1982); In re Search Warrant Dated July 4, 1977, 667 F.2d 117, 130-33 (D.C. Cir. 1981), cert. denied, 456 U.S. 926, 102 S. Ct. 1971, 72 L. Ed. 2d 441 (1982); United States v. Cook, 657 F.2d 730, 734-35 (5th Cir. 1981). See also 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure, § 3.4(f) at 229 (1984). In such cases, only those items confiscated under the overbroad portion of the warrant are suppressed. George, 975 F.2d at 79.

-40-

Id. at 1077-78 (footnotes omitted).

The court finds that the appropriate remedy is to strike the offending language.  Here, that means removing the phrase "including but not limited to" from paragraphs 11 and 13 of the 2004 warrant.  The resulting provisions will read as follows:

> 11) All video tapes and audio tapes maintained in any of the Kaufman properties containing images of past or present residents of the Kaufman House, video tapes containing images of unclothed or partially clothed individuals, video tapes that include images or content related to nudism and or sexual activity, and "Naturist Video Tapes."
> 13) All photographs containing images of past or present residents of the Kaufman House, photographs containing images of unclothed or partially clothed individuals, and photographs that include images related to nudism and or sexual activity.

Any photographs, video tapes, or audio tapes beyond the scope of these two paragraphs must be suppressed.  All photographs, video tapes, and audio tapes that fall within the scope of the redacted paragraphs were properly seized and are not affected by this decision.

## III.  CONCLUSION

With respect to the 2001 search, the court finds that the following items were unlawfully seized because they were beyond the scope of the warrant:  Items 5.08, 6.10, 22.02, 38.30, 38.47, 38.51, 41.03, and 43.05.  The appropriate remedy in this case is to suppress these items.  Pursuant to Fed. R. Crim. P. 41(g), the government must return these items to defendants within ten days of the date of this order.  In all other respects, the 2001 search was lawful.

-41-

Paragraphs 11 and 13 of the 2004 Search Warrant lacked sufficient particularity to satisfy the Fourth Amendment. The court severed the offending language, and the redacted versions of these paragraphs have been provided, _supra_. If any items were seized that were beyond the scope of the redacted paragraphs, they must be suppressed and returned to defendants. Since defendants put on no evidence of specific items that were seized under the offending provisions of these two paragraphs, the court cannot be more specific at this time.[13] In all other respects the 2004 search and the 2005 search were lawful. Nevertheless, defendants still retain the right to object to the admissibility at trial of any seized items if admitting such evidence would run afoul of the United States Constitution or the Federal Rules of Evidence.

IT IS SO ORDERED.

Dated this __20th__ day of September 2005, at Wichita, Kansas.


s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

---

[13] If the government believes that any documents returned to defendants should be preserved for review, it may file copies in a sealed envelope to be opened only upon the order of the court.

-42-