IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-40141-MLB |
| | ) | |
| ARLAN DEAN KAUFMAN, and LINDA JOYCE KAUFMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**GOVERNMENT'S REPLY TO DEFENDANTS' RESTITUTION RESPONSES**

The United States of America, by and through undersigned counsel, hereby submits its reply to defendants' restitution responses (Doc. 388, 403). Despite inconsistencies in their pleadings, defendant Arlan Kaufman adopts defendant Linda Kaufman's response, and she adopts portions of his response. Consequently, the government files this consolidated reply.

INTRODUCTION

The defendants do not argue with the Court's or the government's discussions about the law governing restitution. Instead, the defendants argue facts, with defendant Arlan Kaufman continuing to argue facts now settled by the jury's verdicts regarding guilt and forfeiture. Winnowing the wheat from the chaff of defendant Arlan Kaufman's diatribe, the government believes the issues for the Court to determine should be framed as follows:

(1) Are Mennonite Mutual Aid and the six individuals seeking restitution victims of the counts of conviction?

(2) Is the requested restitution related to the harm caused by the defendants' criminal conduct?

(3) Did the defendants fail to provide any credible evidence to account for monies received from, or taken from, the individual victims?

(4) Was sufficient evidence presented to prove by a preponderance of the evidence that all Medicare payments were for fraudulent claims?

(5) Was sufficient evidence presented to substantiate Mennonite Mutual Aid's loss of $7,227.41?

(6) Are the individual victims entitled to restitution for the monies paid to or used by the defendants for therapy services and nursing services, and for uncompensated labor?

(7) Are Peter and Nancy entitled to restitution for losses related to their abuse at the defendants' hands?

The government contends that all of the above questions must be answered in the affirmative, and that the Court should therefore order restitution for each of the eight victims requesting restitution.

## DISCUSSION

### I. Mennonite Mutual Aid and the six individuals seeking restitution are victims of the counts of conviction.

The defendants claim that Mennonite Mutual Aid ("MMA") and the individual victims seeking restitution were not victims of counts of conviction.[1] Given the scope of the conspiracy charged and proved, this argument is without merit. The Superseding Indictment charged, and the evidence at trial proved, a lengthy conspiracy spanning over 20 years. The conspiracy charged the defendants with multiple violations of law relevant to the issues at hand – involuntary servitude, forced labor, and fraud against

[1] The defendants apparently do not dispute that Medicare is a victim.

Medicare, the Medicare beneficiaries, and the beneficiaries' families. See Doc. 121 at ¶¶ 3, 13, 28, 42. Underlying both the health care fraud and the mail fraud claims were allegations and evidence that the defendants deprived the Kaufman House residents of their intangible rights to honest services. See id. at ¶¶ 3, 13, 42, 73. Additionally, underlying all of the fraud claims was the proposition proved at trial and now admitted by the defendants – that the residents, or their families, or their supplemental insurance were expected to pay 50% of defendant Arlan Kaufman's Medicare claims for "therapy" services. See id. at ¶ 20; see also Doc. 388 at p. 56: Doc. 403 at P. 16 ¶ 7 (defendant Linda Kaufman adopting argument). Consequently, the residents, their families, and the supplemental insurance company – MMA – are fraud victims.[2]

Contrary to the defendants' contentions, their conspiracy did not victimize only the five individuals named in Counts 2 through 6 (Mary H, Barbara, Kevin, Jonathan, James); nor did their conspiracy victimize these five individuals only in the manner outlined in those counts. The complete list of victims is found in Paragraph 8 of the Superseding Indictment, and includes each of the individuals requesting restitution. Furthermore, Kevin, Barbara, Jerry, and Peter are all specifically named in overt acts related to the defendants' mail fraud and/or health care fraud. See Doc. 121 at ¶¶ 51n, 51o, and Counts 9, 11, 17, 18, 20, and 22. Finally, Kevin, Peter, and Jerry[3] all testified

---

[2] The defendants cannot seriously dispute that they billed MMA, and received payments from MMA for "therapy" provided to Peter. The evidence at trial proved this fact. See Exhibits 6A and 6C, attached.

[3] Jerry was a defense witness, but testified about forced nudity, masturbation, and uncompensated labor on cross-examination.

at trial regarding the Kaufman House's brand of sexual slavery, and Kevin and Jerry spoke at length about the uncompensated manual labor.

The defendants' conspiracy affected each of the victims listed in Paragraph 8 of the Superseding Indictment in varying degrees and in varying ways, but there can be no doubt that the six individuals now requesting restitution were victims of the defendants' fraud, and/or were victims of the serious harms the defendants subjected them to, namely -- sexual abuse; psychological abuse and manipulation; physical abuse; coercion; isolation; denial of proper psychological treatment; deprivation of property; substandard living conditions; forced and prolonged nudity; and threats of institutionalization – all of which were among the manner, means, and objects of the conspiracy. See Doc. 121 at ¶ 38.

## II. The requested restitution relates to the harm caused by the defendants' criminal conduct.

The restitution requested by all eight victims relates to the harm caused by the defendants' criminal conduct. There can be no question that the payments from Medicare, Mennonite Mutual Aid, the victims' funds, and the victims' families for defendant Arlan Kaufman's "therapy" services and defendant Linda Kaufman's "nursing" services are directly related to the health care fraud and mail fraud schemes alleged in the indictment and for which both defendants stand convicted. Thus, most of the requested restitution relates directly to the loss caused by the defendants' fraud.

As discussed below, the government offered sufficient evidence at trial and during the restitution proceedings to prove that Medicare lost $216,906.32, and Mennonite Mutual Aid lost $7,227.41, by paying the defendants for "therapy" services

not rendered. Likewise, the government offered sufficient evidence to document the amounts the victims and/or their families paid for "therapy" and "nursing" services, in the form of invoices from the defendants' own records, and calculations based on Medicare co-payments, which the defendants now claim they were owed. See Doc. 388 at p. 56; Doc. 403 at p. 16 ¶ 7 (defendant Linda Kaufman adopting argument). Finally, relevant conduct in the defendants' mail fraud scheme included billing Mary O's family for building funds the defendants now admit should be repaid. See Doc. 388 at p. 51; Doc. 403 at p. 16 ¶ 6 (defendant Linda Kaufman adopting argument).

The government also offered sufficient evidence, unrebutted by the defendants, that the monies paid to them through the social security representative payee program for Barbara and Jerry, as well as the monies they took from Barbara's funds and the civil settlement, with defendant Arlan Kaufman acting as conservator and guardian, have never been sufficiently accounted for; that is, the defendants have never offered any credible evidence that these monies were expended for the victims' benefit, or that these monies were expended for other than the defendants' fraudulent services. Absent such accountings, the Court should award restitution to the victims for these monies.

Similarly, the defendants cannot account for other monies due and owing the victims, such as the monies owed Kevin and Barbara for labor performed for Mary O, and Jerry's mowing labor. Not only was the labor uncompensated, and therefore part of the conspiracy for which the defendants stand convicted, the monies the defendants diverted to themselves were evidently diverted to pay for their fraudulent services, as

admitted by defendant Arlan Kaufman in his response. See Doc. 388 at p. 48; Doc. 403 at p. 16 ¶ 5b (defendant Linda Kaufman adopting argument).[4]

Finally, the restitution amounts are related to the psychological and physical abuse the victims' suffered. The defendants deny the abuse, and therefore deny restitution is owed. The evidence clearly established the abuse, however, and the victims themselves have explained the linkage between that abuse and their claimed losses.

The defendants claim that only experts can establish this linkage, but the government disagrees. Any expert rendering an opinion about the linkage between Nancy's and Peter's abuse and their post-Kaufman hospitalizations would, necessarily, have to interview Nancy and Peter about what they believed led to those hospitalizations. Having an expert testify about what Nancy and Peter reported to him would not alter the evidence before the Court, and any expert conclusion from those reports would be no better than the conclusions the victims themselves have presented to the Court.

---

[4] Defendants claim that there is "substantial evidence" that the monies he earned performing services for Mary O were credited against the amounts he owed for rent and food. See Doc. 403 at p. 7 n.2. Not only is this claim contrary to the claim that these monies were credited against what Kevin owed for defendant Arlan Kaufman's therapy services, it is completely unsubstantiated by documents or other credible evidence. Notably missing from the volumes of records seized from the defendants were invoices to Kevin.

## III. The defendants failed to provide any credible evidence to account for monies received from, or taken from, the individual victims.

The defendants talk at length about restitution being "windfalls" to the victims, allowing them to live and eat "free" for 20 or more years. Notwithstanding the fact that the victims of the defendants' crimes should not be required to pay for being held as virtual captives in substandard living conditions and subjected to the defendants' abuse,[5] this argument is decidedly off the mark, since no victim is asking for the return of monies paid for room and board.

Due to the lack of records for many of the victims (especially Kevin and Barbara),[6] even a lack of defendants' typical invoices representing the cost of rent, food, "therapy" and "nursing" services, the victims and the government substantiated the money flowing into the Kaufman House as a benchmark for restitution, and substantiated certain expenditures as they could. Without proper accountings of these monies – **accountings that were the defendants' responsibility** -- the victims and the government cannot apportion to the penny into "properly" and "improperly" paid columns the income the defendants received. Nevertheless, the evidence the government has presented is far more detailed and reliable than what the defendants have presented. At this stage in the proceedings, it is incumbent on the defendants to produce credible

---

[5] See United States v. Deguzman, 133 Fed. Appx. 501, 508 (10th Cir. 2005); see also Doc. 349 at pp. 5-7 (discussing rent issue).

[6] Defendants complain that the government made no attempt to allocate monies for Barbara's food, housing, and medications. The government cannot do so because there are few records beyond the minimal reports to the probate court allocating expenditures of Barbara's monies. Again, such accountings were defendants' responsibility as representative payee and guardian/conservator.

evidence – not unsupported representations -- that the victims did not sustain the losses claimed. Notably, the defendants acknowledge this burden on page 4 of Doc. 388: "Logically, the burden of proving an offset should lie with the defendant." The defendants have failed to prove any offset.

The defendants claim they have already accounted for the expenditures of the victims' monies through the documents they created during the course of the conspiracy – invoices, social security reports, and probate reports. The defendants also continue to claim that the government has denied them access to their records, which they claim would document the expenditures. Neither claim is true.

Defendants and their counsel have had access to all records since the beginning of these proceedings, and in fact, copied scores of documents during discovery. The documents have remained available for review. On several occasions during trial, defendant Arlan Kaufman claimed he could have proven his innocence, if only the government would allow him access to documents. When the Court challenged these claims, he never responded. The government submits that the defendants can produce no documents in support of the expenditures of the victims' monies because there are no documents which account truthfully for those expenditures.

As to the invoices, the evidence at trial proved the untrustworthiness of the information contained in them. The invoices bill for the same "therapy" services billed to Medicare, which, of course, were not therapy services at all. The invoices bill for therapy and nursing services **after** both defendants lost their professional licenses, a

fact defendant Linda Kaufman concedes in Defendant Arlan Kaufman's Exhibits 16 and 24.[7]

Additionally, the invoices, on their face, prove their untrustworthiness. For example, the invoices for Mary O, contained in Government Exhibit R-22, as compared to invoices for other victims introduced at trial, show that Mary O, for no reason except her family's wealth, was routinely charged more for room and board, even before she was moved to her private room. Similarly, when the defendants had access to Barbara's funds, they charged her differently -- and more -- than the other residents, until her funds were exhausted. See Defendant Arlan Kaufman's Exhibit 42. The invoices to Mary O's family indicate that the defendants had the audacity to charge Mary O for **not** doing chores, and also to charge for Barbara and Kevin **doing** those same chores. See, e.g., Government Exhibit R-22 at Bated pages 051, 054, 059, 061, 069, 076, 085, 107. Then, the defendants charged Mary O for defendant Arlan Kaufman's time supervising Barbara doing those chores. See, e.g., id. at Bated page 089. And, although Kevin provided services that could be considering nursing services – such as monitoring medication – defendant Linda Kaufman continued to bill as though she provided those services.

The bottom line is that the defendants' invoices prove what they billed the victims and their families; they do not prove how the monies paid were actually expended on the victims' behalf. Similarly, the probate records the defendants produced (Exhibit 42),

[7] See Exhibit 16 at marked page 5 ("If Kevin wants to claim partial refund for nursing charges from February 18, 2004 thru Oct. 26, 2004, I could concede that.").

and any existing social security reports[8] are nothing more than their untrustworthy representations of expenditures, without documentary back-up. Notably, the probate records only relate to nine of the 16 years the defendants had access to Barbara's money. These records also clearly show that the defendants completely spent Barbara's readily available monies in the first two years (1989-91), and expended those monies on "therapy" and "nursing" services and undefined "daily charges." As to the expenditures of Barbara's additional monies from her brother's estate, outlined in Government Trial Exhibits 80 and 80A, the defendants made no reports to account for these expenditures, despite an Order from the Harvey County Court. See Exhibit R-25 (attached).

As explained in the government's prior memorandum of law, "[t]o the extent that records are unavailable, the risk of inaccuracy should be borne by the defendant rather than the victims." United States v. Voigt, 89 F.3d 1050, 1092 (3d Cir. 1996); accord, United States v. Olson, 104 F.3d 1234, 1238 (10th Cir. 1997). Moreover, because the defendants purported to be acting as fiduciaries, and breached those duties, they should be deprived of their gains from their wrongdoing. See Gray v. English, 30 F.3d 1319, 1323 (10th Cir. 1994).

The defendants have not rebutted the loss figures presented by the victims and the government, as they have not offered the Court any credible evidence that the

---

[8] The testimony at trial was that few social security reports were found – either in the defendants' own records, or in Social Security's files. The few that do exist do not provide an "accounting" of expenditures, but simply claim that all of the social security money the defendants' received as representative payees was expended on the beneficiary's behalf. Again, this is not an "accounting."

monies they received and took from the victims was actually spent for the victims' benefit. The evidence before the Court indicates the contrary – that the defendants received and took money from their victims and simply paid themselves for their fraudulent "services." Furthermore, there is no evidence that the defendants used the rents to pay mortgages on, or improve the houses, which were clearly substandard.[9] There is also no evidence that the monies collected for "food" and "utilities" related in any way to the actual expenditures for food and utilities. Without such evidence, the Court cannot simply accept the defendants' representations that their victims are due no restitution.

Accordingly, without a proper accounting of how the following monies were expended for the victims' benefit, the Court should treat them as having been expended for the defendants' benefit, in furtherance of their conspiracy:

---

[9] The government has found no evidence that the defendants owed money or paid mortgages on the Kaufman House at the 7th or 8th Street locations during the conspiracy. Additionally, as the Court will recall, the victims' testified that defendants refused to make repairs at the houses, charged them for any damages or repairs, made them perform any repair/maintenance labor done, and told them that no repairs would be done until "new tenants" moved in.

| | |
|---|---|
| Barbara's Initial Inventory[10] | 103,269.95 |
| Barbara's Trust[11] | 96,756.47 |
| Barbara's Social Security[12] | 36,840.00 |
| Jerry's Social Security[13] | 86,888.67 |

**IV. The government offered sufficient evidence at trial to prove by a preponderance of the evidence that all Medicare payments were for fraudulent claims.**

When the victims entered through the doors of the Kaufman House, they unfortunately and tragically left the mental health system and any semblance of standard treatment and instead entered the defendants' abusive world. The Court heard multiple experts testify that nothing they saw or read evidenced any type of "therapy." That the victims survived their ordeal is a testament to the indomitability of the human spirit and not to anything the defendants did. There is simply no evidence in the record that the defendants provided any therapy that could have been properly billed to and paid by Medicare. The defendants have offered nothing to rebut the evidence presented at trial that Medicare paid $216,906.32 for services not rendered.[14]

---

[10] See Exhibit R-18.

[11] See Government's Trial Exhibits 80, 80A, Exhibit R-19.

[12] See Government's Trial Exhibits 60, 60E.

[13] See Government's Trial Exhibits 60, 60D, Exhibit R-11.

[14] The jury's forfeiture verdict does not control the Court's restitution order and cannot be used as a basis to rebut the government's evidence, since the reason for the jury's forfeiture verdict is unknown and unknowable. See Doc. 349 at p. 2 (Government's Memorandum of Law Regarding Restitution).

Consequently, the Court should order restitution to Medicare in the amount of $216,906.32.

## V. Sufficient evidence exists to substantiate Mennonite Mutual Aid's loss of $7,227.41.

The defendants disingenuously argue that there is insufficient evidence in the record that Mennonite Mutual Aid paid them money for "therapy" they billed for Peter. Actually, the evidence in the record substantiates a loss greater than that requested by Mennonite Mutual Aid ("MMA").

In Government Trial Exhibit 6A,[15] a December 27, 1995, invoice defendant Linda Kaufman sent to Peter's mother, Metta, the defendants represent that MMA paid $1,798.93 for his 1994 "psychotherapy" sessions. This same representation is found in Government Trial Exhibit 6C, an October 16, 1996, invoice to Metta.[16] Also in Exhibit 6C is a reference to an MMA payment to Metta for $1,971.14 for Peter's 1995 "psychotherapy."[17] The invoices make clear that the defendants billed Peter's supplemental insurance and his mother for the 50% Medicare did not pay for the "therapy." The defendants' brand of therapy was no more billable to MMA than it was to Medicare.

---

[15] Attached for the Court's reference.

[16] Attached for the Court's reference.

[17] <u>See</u> <u>also</u> Exhibit R-27, attached (Explanation of Claims Benefits from MMA found in defendants' records documenting payment of $1,971.14).

The government has also offered the Declaration of MMA, Exhibit R-3,[18] and two additional checks issued to Kaufman House Treatment Center on January 26, 1998, Exhibit R-4, both of which specifically reference Peter. These two checks represent $3,903.16 paid to the defendants.

Adding these four amounts results in a sum of $7,673.23, which is greater than the $7,227.41 MMA requests as restitution. As did Medicare, MMA paid for services not rendered. The Court should order restitution to MMA in the amount of $7,227.41.

## VI. The individual victims are entitled to restitution for the monies paid to or used by the defendants for therapy and nursing services, and for uncompensated labor.

### A. The victims and/or their families should be paid back for any "therapy" services for which they paid.

Like Medicare and MMA, the victims and their families paid for therapy services not rendered. As the defendants now admit, the families and residents knew they had to pay the 50% Medicare would not be paying for "therapy" services. Indeed, the defendants claim that "[i]f Medicare paid the Kaufmans $200,000, then the residents owe $200,000 for their co-insurance payment." Doc. 388 at p. 56; Doc. 403 at p. 16 ¶ 7 (defendant Linda Kaufman adopting argument). Thus, the defendants have adopted the government's argument -- that a proper and legitimate calculation of the victims' payments for "therapy" is equivalent to Medicare's payments for those services. See Government Exhibit R-2. This calculation applies to four victims, and these calculations

[18] The government submits a new Declaration from Mr. Handrich, detailing his association with MMA. See Exhibit R-26, attached.

are extremely conservative, since they relate to only 1997-2000, less than half of the time period during which the defendants billed Medicare:

| | |
|---|---|
| Jerry J | 5,765.30 |
| Peter L | 10,238.35 |
| Kevin R | 5,478.62 |
| Barbara T | 13,783.80 |

As to Mary O, the summary and invoices submitted to the Court as Exhibits R-21 and R-22 clearly document that her family paid the defendants $52,345 for "therapy," and "case management." There is no evidence that Mary O received any billable therapy or case management services. Indeed, the defendants' admissions in their responses defeat any notion that she did.

First, the defendants admit that Mary O did not attend morning therapy. See Doc. 388 at p. 52; Doc. 403 at p. 16 ¶ 6 (defendant Linda Kaufman adopting argument). Yet, contrary to defendants' representations that they did not bill Mary O for morning therapy, they, in fact, did bill for morning therapy. See, e.g., Exhibit R-22 at Bated pages 001, 002, 009. Second, the defendants admit that Mary O was not a candidate for therapy that involved insight, reasoning, and self-understanding[19] – that is, she was not a candidate for billable individual therapy or group therapy.[20] Yet, the defendants billed for individual therapy. See, e.g., Exhibit R-22 at Bated pages 002, 007. Third, the

[19] See Doc. 388 at p. 52; Doc. 403 at p. 16 ¶ 6 (defendant Linda Kaufman adopting argument).

[20] See Doc. 121 at ¶ 22, describing the recognized forms of therapy billable to Medicare and others. All are described as "insight oriented."

defendants admit that the evening groups for which they billed Mary O's family were not therapy, but were instead group meetings that focused on residents' interactions to enable the group to live together. See Doc. 388 at p. 52; Doc. 403 at p. 16 ¶ 6 (defendant Linda Kaufman adopting argument). As the evidence at trial proved, such "therapy" is not a billable service.[21] Yet, the invoices clearly show that the defendants billed as though evening group was a reimbursable service.

That the victims and their families paid these invoices, or that a probate court may have approved these payments, is no defense. Had the victims and their families and the probate courts known what was really occurring at the Kaufman House, as opposed to what the defendants represented was occurring, no payments would have been made or approved.

At a minimum, the victims are entitled to the above co-payment sums.

**B. The victims and/or their families should be paid back for any "nursing" services for which they paid.**

In determining restitution for nursing services, the Court should not focus on what defendant Linda Kaufman might have done. Instead, the Court should focus on what she **failed** to do as a Registered Nurse. The Court should additionally find that defendant Linda Kaufman cannot be believed, based on her inconsistent representations over time as to what services she may have performed.

---

[21] Kathy DeHart and Dr. Martin Wetzel so testified. Additionally, Government Trial Exhibit 42 at p. 294, so states, as does Defendant Arlan Kaufman's Exhibit 4: "Psychotherapy services are not considered to be medically reasonable and necessary when they primarily include the teaching of . . . social interaction."

**1. Defendant Linda Kaufman denied the victims their intangible rights to honest services.**

During the course of the conspiracy, defendant Linda Kaufman was no more practicing nursing or providing valuable nursing services to the Kaufman House residents than her husband was providing valuable therapy services. Had she been practicing nursing and providing valuable nursing services, she would have prevented the exploitation and abuse the victims suffered. Indeed, as a licensed Registered Nurse, it was her **duty** to do so.

Instead of performing the duty she owed each and every victim, she helped her husband exploit and abuse them. As the allegations by the Nursing Board reflect, she engaged in unprofessional conduct in a variety of ways, including fraudulently completing a renewal application; diverting a patient's property; deceiving, defrauding and harming the public; practicing beyond the scope of her license; financially exploiting her patients; abusing patients by isolation; engaging in sexual misconduct and sexual exploitation; and failing to take action to safeguard her patients. See Exhibit R-28 (Attached). Defendant Linda Kaufman's failure to act to protect her patients made her a danger to them, and resulted in her license being suspended. See Government Trial Exhibit 51A (Attached).

Defendant Linda Kaufman's utter failure to do her duty as a licensed registered nurse -- her denial of the victims' intangible rights to honest services – was a key to the success of both the fraud and the long-term exploitation and abuse of the victims. Consequently, she should not be rewarded by being allowed to keep the fruits of any minimal services she might have provided the residents.

**2. Defendant Linda Kaufman's inconsistent positions over time undermine her credibility, and should counsel against accepting as true her claims of providing valuable services.**

At trial and sentencing, defendant Linda Kaufman, through counsel, claimed on the one hand to have provided valuable services as a psychiatric nurse, while on the other hand claiming to have no ability to provide psychiatric nursing services, for lack of training and knowledge.[22] Similarly, she claimed on the invoices to have provided services daily, while arguing at trial that she was rarely at Kaufman House and therefore could not have known the extent of the activities occurring there.

She billed for services following the suspension of her license, yet concedes now that she should not have done so. See Defendant Arlan Kaufman's Exhibits 16, 24. She claimed the victims were not dependent adults, yet charged for services that clearly indicate the victims could do nothing independently – not even go to the beauty parlor or write checks. See generally, Exhibit R-22. She charged not necessarily for actually providing services, but for "being available" to do so. See Defendant Arlan Kaufman's Exhibit 16 ("Fees were $2/day for medication set up and $2/day for Linda **to be available** daily for consultation . . . .")(emphasis added).

Her "nursing services" fee supposedly included medication "set up" and "consultation," but when it came to Mary O, she billed extensively for "extra trips" to do exactly this and for undefined "extra sessions." See, e.g., Exhibit R-22 at Bated pages

[22] Notably, Defendant Arlan Kaufman's Exhibit 17 indicates that psychiatric nursing services will be provided at Kaufman House. Yet, the expert defendant Linda Kaufman offered at sentencing adamantly denied she provided psychiatric nursing services.

006, 016. To the extent "sessions" and "time" and "consultation" were some form of "counseling," she was practicing outside the scope of her license and therefore could not properly bill for such "services." See R-28 at pp. 2-3.

Essentially, the defendants argue that because nursing services were billed, they occurred. Given the overwhelming evidence that the defendants billed for many things that did not occur – especially therapy – this argument, without further corroborative evidence, is insufficient to overcome the evidence before the Court that proves these nursing services had little, if any, value.

**3. Defendant Linda Kaufman's "nursing" services had little or no value; thus, the victims did not benefit from minimal services that were completely undermined by defendant Linda Kaufman's overarching failure to protect them from harm.**

As Diane Glynn testified at trial, medication management for psychiatric patients entails much more than simply placing medications out for a group of such patients to take at their whim.[23] Such "services" – which defendants admit Kevin could do[24] – had little, if any value. And, since pharmacies will deliver medications for no charge, defendant Linda Kaufman's picking medications up at the pharmacy had no value, except to prevent outsiders from coming to Kaufman House on a regular basis.

Had defendant Linda Kaufman lived up to her duties as a Registered Nurse, the criminal activities giving rise to this prosecution would never have occurred. On fair reflection, the victims received neither value nor benefit from the minimal "nursing"

---

[23] Defendant Linda Kaufman claims this testimony did not occur; defendant Arlan Kaufman remembers the testimony, as does the government. See Doc. 388 at p. 13.

[24] See Defendant Arlan Kaufman's Exhibit 16 at marked pages 15-16.

services she provided. Therefore, the victims should receive back the monies they paid for those worthless services. At a minimum, the victims and the government have documented the following losses associated with "nursing" services:

| | |
|---|---|
| Kevin[25] | 4,239.00 |
| Jerry[26] | 4,552.00 |
| Mary O[27] | 59,173.00 |
| Peter[28] | 2,904.00 |

**C. The defendants owe victims money for uncompensated labor.**

Again, there is no definitive measure of the value of the labor the victims performed over the years, especially the labor involved in making the sexually explicit video tapes. Of course, the defendants kept no records of the hours the victims spent in this labor, or the labor at the farm, or the construction labor at the residences. Nevertheless, the victims and the government have offered the Court credible evidence of at least a very small portion of the monies the defendants owe these victims for their labor.

The defendants owe Barbara $8,560.00 for her services to Mary O. See Exhibits R-21, R-22. Similarly, the defendants owe Kevin $4,450.00 for his services to Mary O. See id. Notably, the defendants admit that they used these monies to pay for therapy Medicare did not pay for. See Doc. 388 at p. 48; Doc. 403 at p. 16 ¶ 5b (defendant

---

[25] See Exhibits R-7 and R-8.

[26] See Exhibit R-12.

[27] See Exhibits R-21, R-22, R-23, R-24.

[28] See Government Trial Exhibits 6A, 6B, 6C or Doc. 121 at ¶ 51o.

Linda Kaufman adopting argument); see also Defendant Arlan Kaufman's Exhibit 16 (Kevin agreed to apply payment from Mary to group charges for Arlan's time since Medicare no longer paid for groups). The defendants also owe Jerry $2,025.37 for his mowing services, an amount which takes into account the credits reflected in the invoices. See Exhibit R-13.

**D. The defendants owe Kevin and Barbara their shares of the civil settlement.**

Defendant Linda Kaufman presented an exhibit with her response indicating that defendant Arlan Kaufman was paid 3 checks totaling $4,813.17. Of that amount, $2,904.00 came from settlement funds, payable to defendant Arlan Kaufman as conservator for Barbara and Kevin. The remaining $1,909.17 came from the attorney's trust fund, as the unused portion of the retainer, and was paid to defendant Arlan Kaufman. The defendants admit that both Kevin and Barbara were entitled to receive money from this settlement. See Doc. 403 at pp. 5-6.

In his declaration, Exhibit R-8, Kevin indicated that his half of the civil settlement was approximately $1,400.00, and that defendant Arlan Kaufman received those monies. Interestingly, this amount is approximately half of the $2,904 figure.

Other than to imply that Kevin is a liar, the defendants offer no credible evidence to refute Kevin's claim that the defendants, and not he, received the benefit of the civil settlement. Nor do they offer any evidence that these monies, once received, were expended for his benefit. The Court should require the defendants to repay Kevin his half of the civil settlement, or $1,452.00. The Court should also now require the

defendants to pay Barbara for her equal half of the settlement, given that there is no record that she ever received this money.

### E. The defendants admit they owe Mary O's family the building fund monies.

The defendants admit that they owe Mary O's family the $23,814.95 in building funds by stating that if the government takes the 7th Street house and sells it, the government can pay Mary O's family back out of those proceeds. See Doc. 388 at p. 51; Doc. 403 at p. 16 ¶ 6 (defendant Linda Kaufman adopting argument). The defendants also admit that the project was not completed. See id. Finally, the defendants admit that Mary O's family essentially paid for the construction twice – through the building fund, and through increased rents. See id. The Court should order restitution to Mary O's family for the $23,814.95 building fund.

## VI. Peter and Nancy are entitled to restitution for losses related to their abuse at the defendants' hands.

The defendants' response to Peter's and Nancy's requests for restitution underscores their complete and utter disregard for their victims, as well as their lack of acceptance of and remorse for the abuse they visited on Peter, Nancy, and others. The defendants' response is simple and two fold: (1) these people are mentally ill, and that's not our fault; and (2) these people are mentally ill, therefore they are not credible.[29]

As to Nancy, the evidence before the Court is Nancy's unrefuted statement at sentencing and her declaration, Exhibit R-10, that her suicide attempts after leaving

---

[29] To say the least, the government contends that Nancy's and Peter's credibility, when compared to the defendants', cannot be genuinely disputed.

Kaufman House were directly related to the abuse she suffered at defendants' hands while at the Kaufman House, including her isolation in the seclusion room, without clothing and without access to a bathroom; the defendants' constant verbal abuse and degradation; the defendants' manipulative and controlling "rules," including rules that visitors were not allowed in the house and the "code of silence" both defendants enforced.

As to Peter, the evidence before the Court is Peter and Metta's unrefuted testimony that Peter sought hospitalization to escape from Kaufman House, and that he required multiple hospitalizations to overcome the horrors he witnessed and suffered at the Kaufman House, including his being tortured with the stun gun, his being isolated in the seclusion room, nude, with a bucket for a toilet, and his being forced to participate in nude activities.

The chilling evidence before the Court is that defendants' victims resorted to drastic means to escape the Kaufman House, including, in Tom's case, suicide. Kevin testified at trial about his continuing struggles in coping with the abuse he suffered, including his continued therapy. Given the evidence that the Court heard concerning Tom and Mary H, who both quickly and dramatically regressed when the defendants served them subpoenas, the Court can feel confident that Peter's and Nancy's struggles and hospitalizations after leaving the Kaufman House were related to the abuse they, too, suffered at the defendants' hands.[30] Although their cries for help were not believed

---

[30] Given the evidence before the Court, it is likely that the defendants' victims are suffering from post traumatic stress disorder. See Exhibit R-30 at ¶ 2 (Affidavit of KR dated July 12, 2005)(attached).

at the time they were living at Kaufman House, they can no longer be discredited as delusional liars.

Finally, the government has presented credible documentary evidence – not speculative evidence, as the defendants claim – regarding the cost of Nancy's and Peter's post-Kaufman House hospitalizations.

## OBJECTIONS TO DEFENDANTS' EXHIBITS

The government objects to the following exhibits, attached to defendant Arlan Kaufman's response, on the grounds of relevance. These documents may have been relevant to the defendants' defense at trial, but they are no longer relevant to this restitution proceeding: Exhibits 1-3, 5-9N, 13-15, 18-20, 23, 25, 28, 32A - 41, 43, and 44. The government objects to the following exhibits, also attached to defendant Arlan Kaufman's response, because they are completely lacking in foundation; many are forms without dates or signatures, and there is no evidence the victims or their families executed such form agreements: Exhibits 10, 12, 17, 21-23, 26, 28-30, 43, 44.

## CONCLUSION

The Court should order restitution in the amounts discussed above for the eight victims requesting restitution. For the Court's convenience, the government has attached a summary of those amounts as Exhibit R-29. Based on the defendants' admissions in their responses, the amounts reflected in this chart are different than those reflected in the chart used at the restitution hearing.

Respectfully submitted,

ERIC F. MELGREN
United States Attorney

s/ Tanya J. Treadway

TANYA J. TREADWAY #13255
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following individuals:

Thomas Haney
Wright, Henson, Clark, Hutton, Mudrick & Gragson, LLP
100 S.E. Ninth Street, 2nd Floor
P.O. Box 3555
Topeka, KS 66601-3555

Stephen M. Joseph
500 N. Market Street
Wichita, KS 67214

s/ Tanya J. Treadway
Tanya J. Treadway #13255
Assistant United States Attorney