# UNITED STATES DISTRICT COURT

## District of Kansas
### (Wichita Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                    CASE NO. <u>04-40141-JTM</u>

ARLAN DEAN KAUFMAN,

        Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
### (Doc. 643)

APPEAR NOW the United States of America, by and through Jared S. Maag, Assistant United States Attorney, and respectfully submit the following in response to the defendant's motion for compassionate release:

## I.   <u>PROCEDURAL HISTORY</u>

On November 8, 2005, a petit jury sitting in Wichita, Kansas convicted the defendant (and his wife) of multiple counts including conspiracy, forced labor, involuntary servitude, health care fraud, mail fraud, making a false

1

writing, and obstructing a federal audit.   (Docs. 311, Verdict Form at 1-3 and

311-1, Verdict Form at 1-5.)

On January 23, 2006, the defendant was sentenced to a controlling term

of imprisonment of 30 years.   (Doc. 352, Judgment at 3.)

**IMPRISONMENT**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of 30 years .

Counts 2, 3, 4, 5 and 6 - 20 years, each count, said terms to run concurrently with each other.
Counts 7 - 22 - 10 years, each count, said terms to run concurrently with each other but consecutive to Counts 2 - 6.
Counts 1, 23, 24, 25, 26, 27, 29, 30, 32, 33 - 5 years, each count, said terms to run concurrently with Counts 2 - 22.

On November 12, 2008, the United States Court of Appeals for the Tenth

Circuit affirmed the defendant's convictions and resulting sentence.   *United

States v. Kaufman*, 546 F.3d 1242 (10th Cir. 2008).

On August 1, 2011, this Court (Belot, J.) issued a memorandum and order

denying the defendant post-conviction relief.   (Doc. 616, Mem. and Order at 1-

23.)

On June 19, 2012, the United States Court of Appeals for the Tenth

Circuit denied the defendant a certificate of appealability and dismissed his

appeal.   *United States v. Kaufman*, 485 F. App'x 313 (10th Cir. 2012) (unpub.)

On June 18, 2020, the defendant filed the instant motion for

compassionate release.   (Doc. 643, Mot. for Release at 1-31.)   The defendant's

projected release date from the Bureau of Prisons is May 1, 2031.

2

II.     <u>FACTUAL HISTORY</u>

The Tenth Circuit described the factual backdrop this case as follows:

In November 1999, Butler County, Kansas, deputy sheriffs observed two men working in the nude on a farm outside the town of Newton. As the deputies approached, the defendant, Arlan Kaufman, a doctor of social work who owned the farm and was fully clothed, directed the two workers into a nearby van, where they put on their clothes. Dr. Kaufman explained that the workers were residents of the Kaufman House Residential Care Treatment Center (the Kaufman House), an unlicensed group home for the mentally ill that he owned and operated with his wife, the defendant Linda Kaufman, a licensed nurse.

The deputies' discovery led to an extended investigation of the Kaufman House by county, state, and federal authorities. They learned that, **over a period of more than fifteen years, the Kaufmans had directed the severely mentally ill residents of the Kaufman House to perform sexually explicit acts and farm labor in the nude while maintaining that these acts constituted legitimate psychotherapy for the residents' mental illnesses**. Moreover, the Kaufmans billed Medicare and the residents' families for the therapy.

In 2005, a federal grand jury charged the Kaufmans with violating the involuntary servitude and forced labor statutes, health care fraud, mail fraud, and obstructing a federal audit. The government also sought forfeiture of the Kaufmans' assets. A jury convicted each of the Kaufmans of the following offenses: conspiracy (under 18 U.S.C. § 371); two counts of forced labor (under 18 U.S.C. § 1589); three counts of involuntary servitude (under 18 U.S.C. § 1584); sixteen counts of health care fraud (under 18 U.S.C. § 1347); nine counts of mail fraud (under 18 U.S.C. § 1341); one count of obstructing a federal audit (under 18 U.S.C. § 1516); and one count of criminal forfeiture (under 18 U.S.C. § 982). The jury convicted Dr. Kaufman of an additional count of submitting a false document to Medicare (under 18 U.S.C. § 1035).

3

The district court sentenced Dr. Kaufman to 360 months' imprisonment, upwardly varying from the Guideline range of 160–210 months. In contrast, the court sentenced Mrs. Kaufman to eighty-four months' imprisonment, a downward variance from a Guideline range of 135–168 months. In support of that decision, the court reasoned that Mrs. Kaufman had probably been convicted as an aider and abettor rather than a principal, that she had a dependent personality disorder, and that she had accepted responsibility for the offenses.

******

The Kaufmans were the joint owners and managers of the Kaufman House Residential Care Treatment Center, an unlicensed residential home for the chronically mentally ill. They also owned a farm in neighboring Butler County, where some of the offenses occurred.

The Kaufman House actually consisted of three separate houses in Newton, Kansas. Two of the houses served as residences, while the third house served as an office, a meeting place, and the site of some of the "therapy" conducted by the Kaufmans. The Kaufmans acquired these properties in the 1970s. Initially, they were used to provide housing for college students and some mentally ill patients who could not be cared for in other institutions. **By the early 1980s, the Kaufman House residents were all mentally ill patients, most of whom suffered from schizophrenia and schizoaffective disorders. Some of the residents lived at the Kaufman House for ten, fifteen, and even twenty years**.

The Kaufmans' sole source of income over the period from 1981 until October 2004 (when they were arrested by federal authorities) was the money that they made from the Kaufman House. They obtained their income from room and board payments, Medicare proceeds, social security benefits, and supplemental insurance payments. The Kaufmans billed the government, insurance companies, and the residents' families for psychotherapy and nursing services that they provided at the Kaufman House.

4

A. <u>Treatment of Residents at the Kaufman House</u>

**The nude farm labor that the Butler County Sheriff's deputies observed in November 1999 was only a small fraction of the unusual practices to which the Kaufman House residents were subjected**. In June 2001, agents from the United States Department of Health and Human Services obtained a warrant and conducted a search of the Kaufmans' residence. In the Kaufmans' bedroom, **the agents discovered seventy-eight videotapes, many of which contained graphic scenes of the Kaufman House residents engaging in sexual acts at the express direction of Dr. Kaufman, who was operating the camera**.

At trial, an investigator from the Kansas Attorney General's office informed the jury that he had watched forty-eight of the tapes. He reported that forty-four of them contain scenes of the Kaufman House residents appearing in the nude; fourteen tapes show the residents masturbating; six show them massaging one another; and five show them shaving one another's genitals. In several instances, the tapes show Dr. Kaufman touching the genitals of some of the residents (two women and a man). Repeatedly, the camera zooms in on the residents' genitals. The tapes also show Dr. Kaufman directing the residents to engage in particular acts—for example to examine a fellow resident's vagina, to stand in a position so that a resident's penis could be seen by the camera, and to masturbate in front of the camera and the other residents. The prosecution offered some of the tapes into evidence and played portions of them for the jury.

The prosecution also offered testimony from the Kaufman House residents regarding the acts depicted in the tapes. A resident named Kevin, who lived at the Kaufman House from 1979 until 2004, explained that Dr. Kaufman had an interest in nudity and naturalism and spoke of it frequently. In Kevin's view, most of his fellow residents were initially reluctant to remove their clothes, but Dr. Kaufman persuaded them, in part by stating that the nudity would be therapeutic, particularly with regard to the distorted images that many of the residents had regarding their own bodies. Eventually, at Dr. Kaufman's direction, the Kaufman House developed rules that

required some of the residents to be nude when engaging in certain activities—for example participating in group therapy sessions, eating dinner, and watching television. A resident named Jonathan gave similar testimony: Dr. Kaufman had suggested that he should remove his clothes so that he would have less anxiety.

The residents also testified that, in the mid–1990s, they began performing manual labor on the Kaufmans' farm, usually in the nude. The work included removing items from a mouse-infested house, pulling up a tree stump, tearing down a fence, shoveling manure, and moving cement blocks.

The prosecution argued that some of the Kaufman House residents became "undercompensated actors in a never-ending pornographic show." Rec. vol. 20, doc. 477, at 3532. It offered testimony from two psychiatrists, a psychologist, and a social worker that **no therapeutic justification existed for the nudity and the sexual acts suggested by Dr. Kaufman, and that the practices depicted on the videotapes were quite harmful to patients suffering from severe mental illnesses like schizophrenia**. One of the expert witnesses stated, "I probably can't express how strongly I feel. It is unprofessional. It is awful." Rec. vol. 12, doc. 448, at 704 (direct testimony of Walter Menninger, M.D.). Another expert, a professor of social work, opined that by simultaneously serving as the residents' therapist, landlord, employer (as to the farm labor), guardian (as to one of them), and travel companion (when he took them on a vacation to a Florida nudist colony), Dr. Kaufman had violated the prohibition on dual relationships set forth in the profession's code of ethics.

The prosecution also offered evidence that the Kaufmans coerced the residents to perform a variety of acts, including the sexual conduct and nudity depicted in the videotapes and the nude manual labor at the Kaufmans' farm. For example, several of the residents testified that the Kaufmans used and threatened to use physical force. On one occasion, Dr. Kaufman grabbed a resident named Barbara by the hair, put his hands over her mouth, and dragged her up the stairs. He often struggled with her and produced welts on her throat. Similarly, a resident named Peter testified that Dr. Kaufman beat him

and used a stun gun to subdue him. Other residents testified that Dr. Kaufman demonstrated the stun gun to them.

**The residents further testified that the Kaufmans used a seclusion room as punishment**. A resident named Nancy reported that the room had neither a bed nor a toilet and that those who were confined there had to use a bucket instead. Kevin reported that Barbara, a fellow resident, was confined in the seclusion room for months at a time. During the period before the residents began to walk around the house in the nude, the Kaufmans would take the clothes of those who were confined in the seclusion room, using nudity as a form of punishment. The residents added that there were substantial restrictions on their daily activities. Thus, Barbara and a resident named Mary were barred from answering the door and leaving the house without supervision and were often locked in their rooms at night.

Dr. Kaufman also told the residents that they were lucky to be living in the Kaufman House and that other placements would be more restrictive. Residents Barbara, Peter, and Jonathan testified that he threatened them with institutionalization in other mental health facilities if they disobeyed the Kaufman House rules.

Additionally, after the Kaufmans took some of the residents to a nudist colony in Florida, they required them to pay for airfare and other costs by working on the Kaufmans' farm. Kevin testified that the debt never ended, and when some of the residents complained about working on the farm, Dr. Kaufman stated that they stilled owed money for the Florida trip. In the prosecution's view, the Kaufmans also used this indebtedness to compel the nudity, the sexual acts, and the farm labor.

Finally, the residents testified that the Kaufmans developed and maintained a code of silence. The Kaufmans repeatedly told the residents not to share information about the activities at Kaufman House, limited visits and mail from families and friends, and restricted the information that could be provided to medical personnel and law enforcement officials.

> Dr. Kaufman testified in his own defense. He contended that the Kaufman House residents had voluntarily chosen to engage in nudity. As to the sexual acts depicted in the videotapes, Dr. Kaufman maintained that they too were performed voluntarily by the residents. He characterized the sexual behavior as appropriate for residents who had lived together for long periods of time: "I think you have to allow certain kinds of intimacy, physical, emotional, when people are choosing that this is gonna be the family now...." Rec. vol. 18, doc. 472, at 3113. He further contended that his tolerance of the nudity and sexual acts had helped some of the residents stop acting inappropriately in public.

*United States v. Kaufman*, 546 F.3d 1242, 1246-50 (10th Cir. 2008) (emphasis supplied).

### III.   ARGUMENT

The defendant maintains that he is a proper candidate for compassionate release on grounds that he is "an 83-year old first-time offender with Stage IV prostate cancer that has metastasized to his spine, pelvis, and ribs, as well as other serious medical conditions, including peripheral vascular disease, stage 3 chronic kidney disease, hypertension, and coronary atherosclerosis." He further submits that "[h]e has served almost 15 years of his 30-year sentence and his advanced age, terminal illness, and deteriorating health are extraordinary and compelling reasons to grant a reduction in sentence. [The defendant] would be deserving of compassionate release during normal times; however, his compromised health and age place him at imminent risk of death if he were to

contract the novel coronavirus (COVID-19)."   (Doc. 643, Mot. for Release at 1.)

The government objects to the defendant's motion for compassionate release and submits the following in support of its position that the scope and nature of the defendant's crimes wholly justified the 30-year sentence imposed in this case and is by itself sufficient reason to deny the motion.   Moreover, as demonstrated below, the Section 3553(a) factors weigh heavily against the defendant's release from incarceration.   In the end, denying the defendant's motion for early release will not only uphold the public's faith in the justice system, it will strengthen the resolve of the courageous victims who survived the sadistic abuse meted out by the defendant, and will ultimately send a message that after a just conviction and a sentence appropriate to the crime, the defendant cannot escape the full and just consequences of his criminal conduct.   The motion must be denied.

## A.   Defendant's Obligations

The defendant is burdened with demonstrating that circumstances exist warranting this Court's consideration of compassionate release.   *See United States v. Rodriguez-Orejuela*, --- F.Supp.3d ---, 2020 WL 2050434, at *5 (S.D. Fla. Apr. 28, 2020) (noting that under the CARES Act / Section 3582(c) framework

the defendant bears the burden of establishing that compassionate release is warranted); *United States v. Holden*, --- F.Supp.3d ---, 2020 WL 1673440, at *3 (D. Ore. Apr. 6, 2020) (noting that "[a] defendant seeking a reduction in his terms of imprisonment bears the burden to establish both that he has satisfied the procedural prerequisites for judicial review and that compelling and extraordinary reasons exist to justify compassionate release."); *United States v. Epstein*, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020) (Slip Op.) ("Simply put, under the FSA, a defendant seeking a reduction in his term of imprisonment bears the burden of establishing both that he has satisfied (1) the procedural prerequisites for judicial review, and (2) that compelling and extraordinary reasons exist to justify compassionate release.").[1]

---

[1] To the extent the defendant seeks release to home-confinement that request must be rejected.   Under the CARES Act, Pub. L. 116-136, Mar. 27, 2020, 134 Stat. 281, § 12003(b)(2), this Court has no authority to place the defendant on home-confinement.    That responsibility lies exclusively with the Director of the Bureau of Prisons.   *United States v. Nash*, 2020 WL 1974305, at *3 (D. Kan. Apr. 24, 2020) (Slip Op.) (". . . the court lacks authority to order home confinement under the CARES Act."); *See also, United States v. Serfass*, 2020 WL 1874126, at *3 (M.D. Penn. Apr. 15, 2020) (Slip Op.) (". . . the determination of which inmates qualify for home confinement under the CARES Act is with the BOP Director.); *United States v. Black*, 2020 WL 2213892, at *1 (S.D. Ohio, May 7, 2020) (Slip Op.) ("The BOP has the sole authority to decide whether home confinement under the CARES Act is appropriate."); *United States v. Daniels*, 2020 WL 1938973 at *1-2 (N.D. Ala. Apr. 22, 2020) (Slip Op.) (similarly holding that only the BOP has the authority to place a defendant on home confinement under the CARES Act); *United States v. Boyd*, 2020 WL 2106023, at *1 (E.D. Tenn. May 1, 2020) (Slip Op.) ("The CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. Courts therefore do not have power to grant relief under Section 12003 of the CARES Act.") (internal citations omitted).    Thus, should the Court construe the defendant's request as one

Here, the defendant falls short of satisfying the requirements for compassionate release under 3582(c)(1)(A)(i).   Thus, for the following reasons, this Court must overrule his motion and deny the requested relief.

B.   BOP's Response to the COVID-19 Pandemic[2]

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time resulting in disruption to our society and economy.   In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

As of this pleading, BOP has **131,264 federal inmates** in BOP-managed institutions and **13,463** in community-based facilities. The BOP staff complement is approximately 36,000.   There are **1,563 federal inmates** and **164 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **5,135 inmates** and **579 staff** have recovered.   There have been **90**

---

for home-confinement, such a request must be summarily denied.

[2] It should again be noted that the Attorney General has directed the BOP to prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 under the CDC risk factors—particularly those at institutions where there have been COVID-19 outbreaks—and BOP is devoting all available resources to executing on that directive.   Additionally, BOP is devoting all available resources to assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program and to then process those inmates for transfer as quickly as possible.

**federal inmate deaths** and **1 BOP staff member death** attributed to COVID-19 disease.[3]

The current modified operations plan is stated in full at https://www.bop.gov/coronavirus/covid19_status.jsp.   Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.   BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably some inmates have become ill, and more likely will in the weeks ahead.   But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.   For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.   It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.   It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.   It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in

---

[3] https://www.bop.gov/coronavirus/ (last visited 2 July 2020).

these difficult times.   And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

C.   Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment.   Before filing that motion, however, the defendant must first request that BOP file such a motion on his behalf pursuant to Section 3582(c)(1)(A).   A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."   *Id.*

If that exhaustion requirement is met, as it is here, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is

consistent with applicable policy statements issued by the Sentencing Commission." *See* Section 3582(c)(1)(A)(i).   Again, as the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction.   *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under Section 3582(c)(1)(A).   As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement."   U.S.S.G. § 1B1.13.[4]

---

[4] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under Section 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the government submits that the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i).   Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).   The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances.   U.S.S.G. § 1B1.13, cmt. n.1(B)-(C).   Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons."   U.S.S.G. § 1B1.13, cmt. n.1(D).

      D.    <u>Extraordinary and Compelling Reasons</u>

As explained above, under the relevant provision of Section 3582(c), a court can grant a sentence reduction *only* if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."   Section 3582(c)(1)(A)(i).   The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions.   U.S.S.G. § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, the defendant first must establish that his condition(s) fall(s) within one of the categories listed in the policy statement.   Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover."   U.S.S.G. 1B1.13, cmt. n.1(A).   If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his motion must be denied.

Importantly, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction.   The categories encompass specific serious medical conditions afflicting an individual inmate, *not* generalized threats to the entire population.   As the Third Circuit recently held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745 at *2 (N.D. Cal. Mar. 25, 2020) (Slip Op.) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[5]   To classify COVID-19 as an

---

[5]   *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020); *United States v. Fuentes*, 2020 WL 1937398 (E.D. Cal. Apr. 22, 2020); *United States v. Singh*, 2020 WL 1937437 (E.D. Cal. Apr. 22, 2020) (62-year-old with no ailments); *United States v.*

extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement.   Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, *not* the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under Section 3582(c)(1)(A).   If an inmate has a chronic

---

*Spruill*, 2020 WL 2113621, at *4-5 (D. Conn. May 4, 2020); *United States v. Harris*, 2020 WL 1969951 (M.D. Fla. Apr. 24, 2020); *United States v. Garcia*, 2020 WL 2039227 (C.D. Ill. Apr. 28, 2020) (the court broadly holds that the risk of infection to an inmate is not a circumstance within § 1B1.13, which is binding); *United States v. Wright*, 2020 WL 1976828, at *5 (W.D. La. Apr. 24, 2020) ("The Court stresses that the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances. Rather, those circumstances are applicable to all inmates who are currently imprisoned and hence are not unique to any one person. The Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner."); *United States v. Hiller*, 2020 WL 2041673 (D. Md. Apr. 28, 2020) (being over age 65 insufficient); *United States v. Espinal*, 2020 WL 2092484 (E.D.N.Y. May 1, 2020); *United States v. Hood*, 2020 WL 2091070 (W.D.N.C. Apr. 30, 2020); *United States v. Stanard*, 2020 WL 2219478, at *4 (W.D. Wash. May 7, 2020) (not justified by "the mere elevated risk of contracting a pandemic virus in prison, even if such a higher risk exists.") (citation omitted); *United States v. Pao Xiong*, 2020 WL 2042776 (E.D. Wis. Apr. 28, 2020).

medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[6] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.   U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

Recently, the Department of Justice has, consistent with the Centers for Disease Control (CDC), identified certain risk factors that place inmates at higher risk of complications from COVID-19.[7]   Thus, an inmate that presents

---

[6]   *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

[7] The factors include the following: asthma (moderate to severe); chronic kidney disease being treated with dialysis; chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis; diabetes, including type 1, type 2, or gestational; hemoglobin disorders, such as sickle cell disease and thalassemia; immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications; liver disease, including cirrhosis; serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and severe obesity, defined as a body mass index (BMI) of 40 or above.

with one of the named CDC factors, as confirmed by medical records, and who

is not expected to recover from that condition, is deemed to have established an

extraordinary and compelling reason allowing for compassionate release under

Section 3582(c)(1)(A) and the guideline policy statement as detailed in U.S.S.G.

Section 1B1.13.   In other words, a specified and confirmed chronic medical

condition presents "a serious physical or medical condition . . . that substantially

diminishes the ability of the defendant to provide self-care within the

environment of a correctional facility and from which he or she is not expected

to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to

provide self-care against serious injury or death as a result of COVID-19 is

substantially diminished, within the environment of a correctional facility, by

the chronic condition itself.[8]

Additionally, as part of its analysis of the totality of circumstances, the

Court should consider whether the inmate is more likely to contract COVID-19

if he is released than if he remains incarcerated.   That will typically depend on

---

[8] District courts have generally stated that a defendant's medical condition "must be one of substantial severity and irremediability."   *United States v. Lisi*, 2020 WL 881994, at *4 (S.D.N.Y. Feb. 24, 2020); *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (relief is "rare" and "extraordinary"); *United States v. Polnitz*, 2020 WL 1139836, at *2 (E.D. Wis. Mar. 9, 2020) (condition must be extraordinary; "Many inmates suffer from pain and mental illness.")

the inmate's proposed release plan and whether a known outbreak has occurred at his institution.

Given the defendant's current medical condition, the government is constrained to concede that he presents a series of medical conditions that qualify as extraordinary and compelling circumstances for this Court's consideration of a sentence reduction.   However, for the following reasons, this Court should not endeavor to reward the defendant with early release.

E.   Section 3553(a) Factors

To the extent that a defendant can establish an extraordinary and compelling reason for release based upon a confirmed and documented medical condition, satisfying that burden does not resolve the defendant's entitlement to a reduction in sentence or release from confinement.   This Court must still consider whether the defendant poses a danger to the community and other relevant factors under Section 3553(a) before making the ultimate decision on release.   Accordingly, this Court must consider (1) the defendant's personal history and characteristics; (2) his sentence relative to the nature and seriousness of his offenses; (3) the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public; (4) the need for rehabilitative services; (5) the applicable guideline

sentence; and (6) the need to avoid unwarranted sentencing disparities among similarly-situated defendants.   *See* 18 U.S.C. § 3553(a)(1)–(6)).

Applying the Section 3553 factors here strongly militate against reducing the defendant's 30-year sentence to time-served.   Without question, a reduction to time-served would run counter relative to the nature and seriousness of his multiple and egregious offenses and the need for this particular sentence to provide just punishment and promote respect for the law.   *See, e.g.*, *United States v. Moskop*, 2020 WL 1862636 (S.D. Ill. Apr. 14, 2020) (72-year-old inmate "has suffered or suffers from various acute and chronic conditions including depression, high blood pressure, high cholesterol, an enlarged prostate, hearing loss, kidney disease, bleeding on the brain, and mental deterioration," but has served less than half of a 240-month sentence for serious fraud, and is at no particular enhanced risk from COVID-19); *United States v. Logan*, 2020 WL 730879 (W.D. Ky. Feb. 13, 2020) (81-year-old defendant is eligible for consideration, as he suffers from prostate cancer, glaucoma, blindness, diabetes, and other medical conditions, and has served more than 22 years of his life sentence; but relief is denied because reducing the defendant's sentence "would minimize the nature and seriousness of the offense," which involved arson of a hotel resulting in four deaths); *United States v. Arana*, 2020 WL 2214232 (E.D.

Mich. May 7, 2020) (defendant's health is declining due to pancreatitis; has served 24 years of life sentence for drug offenses and murder; denied due to nature of offenses); *United States v. Chambliss*, 948 F.3d 691 (5th Cir. 2020) (affirming district court's denial of compassionate release to terminally ill defendant serving 30 year sentence for drug trafficking).

Likewise, reducing the defendant's sentence to time-served would prove to be a significant and unjustified windfall under the circumstances, even if the defendant is nearing the end of his life based upon the present medical diagnosis. *United States v. Israel*, 2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019) (accepting as true "that the defendant/inmate is severely disabled by incurable and progressive medical conditions, and that his condition has worsened substantially since he was originally incarcerated," compassionate release is denied, given the severity of the criminal conduct, involving a massive Ponzi scheme: "Indeed, it would make a mockery of the sentencing statute if this financial fraudster, who ruined the lives and finances of hundreds of people while living the high life of an ostensibly successful hedge fund manager, were to . . . have his sentence reduced.")

While the defendant's age and infirmity rule out any continued dangerousness, the seriousness of the defendant's crimes simply cannot be

23

understated.   His indisputably brutal and inhumane treatment of the many victims in this case warrants his continued incarceration.   And while the chances of the defendant satisfying his term of incarceration is unlikely, his release now will only serve to re-victimize those whom the defendant sadistically abused over many years.   In short, early release would run contrary to the purpose of sentencing in this very case which demands that the defendant serve the entirety of his term of incarceration.   *Cf. United States v. Willis*, 382 F. Supp. 3d 1185, 1188–89 (D.N.M. 2019) (compassionate release not warranted for blind, wheelchair-bound defendant who required round-the-clock medical care and had a life expectancy of 18 months, given severity of his wire fraud).   Stated otherwise, the defendant's release would prove to be profoundly unjust,  and such an order would otherwise fall remarkably short of demonstrating respect for the law.

More to the primary point of concern, releasing the defendant undervalues the gravity of the crimes that he committed and severely minimizes the seriousness of the particularly heinous acts that he performed on the victims who must continue to live with the shame and trauma inflicted upon them.   *Cf. United States v. Webster*, --- F.Supp.3d ---, 2020 WL 618828, at *8 (E.D. Va. Feb. 10, 2020) (rejecting terminally ill defendant's compassionate release motion on

grounds that "allowing this twice-convicted murderer to walk free before he has completed his sentence would be unjust to his victims and the public at large"). Given the letters submitted thus far, this Court is well-aware of the impact the victims will undoubtedly feel if the defendant is released having served only one-half of his sentence.   The defendant certainly has a voice in this argument, but the victims have an equal right to be heard and a more compelling argument to make here, namely, that the defendant should not benefit from early release given the enormity of his crimes and the need for just punishment.

In the end, denying the defendant's motion will uphold the public's faith—and the victims' trust—in our system of justice and provide the necessary balance that is ultimately deserving in this case.   Thus, given that the applicable 3553(a) factors do not weigh in favor of the defendant's request for compassionate release, his arguments must be rejected and his motion denied.[9]

IV.   CONCLUSION

For the foregoing reasons, the government, on behalf the courageous

---

[9] The government feels compelled to note that it does not reflexively move to challenge every motion for compassionate release.   The Department of Justice remains cognizant of the many situations that are deserving of greater consideration for compassionate release. However, this case does not under any circumstance deserve the government's empathy. The defendant's crimes are simply too abhorrent to forgive and his continued incarceration must stand as an example to those who would seek to physically and mentally abuse those who cannot defend themselves.

victims who suffered at the hands of this defendant, humbly moves this Court

to deny the defendant compassionate release and in turn dismiss his motion.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney
District of Kansas

By:   /s/   *Jared S. Maag*

JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
jared.maag@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2d day of July, 2020, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system and that a copy of the same was delivered electronically to:

Zachary L. Newland
Senior Litigation Counsel
Brandon Sample PLC
P.O. Box 250
Rutland, Vermont 05702
Email: zach@brandonsample.com

James R. Pratt
445 N. Waco
Wichita, Kansas 67202
Jim@PrattLawLLC.com

By:        /s/ *Jared S. Maag*

JARED S. MAAG, Ks. Bar. No. 17222
Assistant United States Attorney

27